v.

**W.F.; Cabinet for Health and Family Services, Commonwealth of Kentucky; G.F., a Minor Child, Appellees.**

**N.L., Appellant,**

v.

**J.D.; Cabinet for Health and Family Services, Commonwealth of Kentucky; D.D., a Minor Child; W.F.; and G.F., Appellees.**

Nos. 2010–CA–001787–ME, 2011–CA–000091–ME, 2010–CA–001815–ME, 2011–CA–000095–ME.

Court of Appeals of Kentucky.

May 25, 2012.

Rhonda M. Copley, Ashland, KY, for appellant.

Katherine K. Kendall, Greenup, KY, for appellee, Cabinet for Health and Family Services.

James W. Lyon, Jr., Greenup, KY, for appellee, W.F.

Amy R. Craft, Greenup, KY, for appellee, J.D.

Before TAYLOR, Chief Judge; DIXON and LAMBERT, Judges.

## OPINION

LAMBERT, Judge:

These four consolidated appeals arise from a juvenile action in which the Green-

up Family Court found N.L. neglected her two children and subsequently awarded permanent custody to their respective fathers. Having carefully considered the record from the proceedings below and the parties' arguments on appeal, we hold that the family court erred in awarding custody to the fathers. Therefore, we reverse the orders on appeal.

For ease of understanding, we shall first set forth the parties and other individuals involved in these cases as well as how we shall refer to them in this opinion. N.L., the appellant, (hereinafter "the Mother"), is the biological mother of two daughters. Her first child is D.D., who was born on February 8, 2000 (hereinafter "Child 1"). Child 1's biological father is J.D., who is the Mother's former husband and currently lives in Florida (hereinafter "Father 1"). The Mother's second child is G.F., who was born on October 27, 2004 (hereinafter "Child 2"). Child 2's biological father is W.F., a resident of Kentucky with whom the Mother had a prior relationship but never married (hereinafter "Father 2"). Father 2's parents (and Child 2's grandparents) are W.F. and G.F. (hereinafter "the Grandparents"). The Grandparents are not related by blood to Child 1. At the outset of the proceedings below, the Mother had a boyfriend who shared her residence (hereinafter "the Boyfriend"), which was next door to the Grandparents' residence.

On May 5, 2010, Andrea Scott, a social worker with the Cabinet for Health and Family Services (hereinafter "the Cabinet") filed juvenile dependency, neglect, and abuse petitions with the Greenup Family Court alleging that both Child 1 (case no. 10–J–00107–001) and Child 2 (case no. 10–J–00108–001) were neglected. The basis for the petitions was an incident on April 30, 2010, when the Mother and the Boyfriend were arrested for being in-

volved in a dispute. Both were intoxicated at the time, and both tested positive for THC and Oxycontin. The children were present and witnessed the incident.

The family court held a temporary removal hearing on May 10, 2010. All of the interested parties attended the hearing and were appointed counsel. The court also appointed a Guardian *ad litem* to represent the interests of the children. The family court found that the children were in need of temporary placement because the Mother and the Boyfriend were on drugs, that reasonable efforts were made to prevent removal, that there were no less restrictive alternatives available, and that reasonable grounds existed for the court to believe it would be contrary to the children's welfare if they were to be returned to the home. Accordingly, the family court placed both children in the temporary custody of the Grandparents and scheduled an adjudication hearing for May 24, 2010.

Prior to the adjudication hearing, Ms. Scott provided a written report updating the court on the case, the results of which were discussed in court. The report stated that charges against the Mother and the Boyfriend had been dropped and that the Mother's blood test on May 14th was negative for any substances. Both Father 1 and Father 2 had requested that his respective child be placed with him. Florida social services had completed Father 1's home evaluation, but Father 2's criminal history, including DUI charges, would not permit Ms. Scott to place Child 2 with him. At the adjudication hearing, the Mother admitted to the allegations in the petition, the court concluded that the children were neglected and ordered them to remain in the temporary custody of the Grandparents.

The family court then held a disposition hearing on June 14, 2010. Prior to the

hearing Ms. Scott filed a follow-up report detailing the results of the Mother's blood and urine tests (noting that one urine test was positive for THC) as well as the case plan put into place for the Mother. The case plan included parenting classes and a substance abuse assessment through Pathways. Ms. Scott also reported that the Mother and the Boyfriend had ended their relationship. The family court placed Child 2 in the custody of Father 2, and placed Child 1 in the custody of the Grandparents, but permitted Father 1 to take Child 1 to Florida for four weeks of visitation. Finally, the court scheduled a permanent custody hearing.

Prior to this hearing, Cabinet workers filed two reports. Social worker Angela Rucker submitted a report on August 4th, stating that the Mother had continued to call in every morning as ordered and had not failed any drug screenings since June 2nd. She had obtained housing and employment, and she had completed parenting classes and substance abuse assessments and counseling. Social worker Chrystal Young filed a report on August 6th, also reporting that the Mother had made significant progress on her case plan and had been cooperative with the Cabinet.

At the beginning of the hearing on August 9, 2010, the parties engaged in some argument regarding whether the family court could actually hold a permanent custody hearing due to the lack of a motion to change custody or affidavits supporting such a change. The family court disagreed with the Mother's assertion that it could not hold a permanent custody hearing and proceeded with the hearing.

The Cabinet called Ms. Young, a Cabinet supervisor for the ongoing team, to testify. She met with the Mother to go over the case plan on July 27th, the goal of the plan being to return the children to the Mother's home. Ms. Young discussed the elements of the plan, including supervised visitation with the children, parenting classes, obtaining employment and housing, and substance abuse counseling. Ms. Young testified that the Mother was ahead of the game and had made much progress with her plan. She recommended that the children stay in their current placements and that the Mother be permitted unsupervised contact with both of them. Ms. Young did not have any contact with the fathers because her focus was on the mother. Ms. Young also related statements Child 1 had made about the Mother, such as her desire to live with her father due to her Mother's bad choices related to fighting with her brother and waiting until the weekend to do laundry. Child 1 went on to relate good changes as well, reporting that the Mother was no longer drinking or lying. At the conclusion of her testimony, Ms. Young requested a four-week continuance to allow the Mother to make more progress on her plan.

The next witness the Cabinet called was another social worker, Ms. Scott. Ms. Scott investigated the original complaint, and she turned the case over to another worker in July. She related that she had contacted and investigated the two fathers and had visited Father 2's home. She also related Father 2's criminal history, testifying that his last DUI charge occurred in 2002. Ms. Scott testified about the Mother's case plan, and she specifically stated that the Mother was the only parent addressed in the plan, not the two fathers. She also discussed a substantiated allegation of abuse involving Father 1 in Ohio, but regarded him as the victim. She did not find any criminal history related to Father 1 in either Kentucky or Florida.

The Mother was the next witness to testify. She testified that both children had lived with her since birth and that

custody orders had been entered in 2005 for Child 1 and in 2006 for Child 2. She stated that she was working on her case plan, but admitted that she had made a mistake and was working hard to repair the situation. The Mother testified about her past drug use, including being prescribed Percocet in 2009 for back and neck pain. She admitted that the Boyfriend had given a non-prescribed Percocet pill to her in the days prior to the altercation and that he had also given her marijuana. The Mother admitted that she started using marijuana at the age of sixteen and that she drank alcohol, consuming a couple of beers two to three times per week. She and Father 1 used several drugs while they were together. She testified that she moved to Kentucky in July of 2009 and that she had been in Florida for the two previous years while she attended school. She indicated that the children had spent the majority of their lives in Ohio. Regarding the Boyfriend, the mother stated that at the time of the altercation, she had known him for seven months and that he had moved himself in to her residence after they had been in a relationship for one month. She had permitted the Boyfriend's fourteen-year-old son to watch her children on occasion, but he did not live with them. The Mother also described the April 30th altercation, stating that she and the Boyfriend had been at dinner and had consumed a few drinks. When they returned home at about 6:30 p.m., she got in an argument with the Grandmother.

Father 1 testified next and orally requested that he be awarded custody of Child 1. He had been living in Florida for three years at the time of the hearing and had previously lived in Middletown, Ohio. He and the Mother divorced in the mid–2000s. Despite the divorce, Father 1 remained active in Child 1's life, paying child support, purchasing clothing for her, and exercising visitation. He admitted to a past history of drug use, but stated that he stopped using any drugs when Child 1 was born. Father 1 also related the details of a prior domestic violence incident between him and another former wife, when she attacked and injured him in the presence of Child 1. At the time of the hearing, Father 1 was living in a four-bedroom house with his fiancée, her three children, another of his biological daughters, and two adopted children.

The last witness to testify was Father 2, who also orally requested permanent custody of his daughter. He stated that he was a welder but had been laid off from his employment. He is currently engaged. Father 2 testified that Child 2 had been in his custody for most of the time since the neglect case had started. Regarding his relationship with the Mother, Father 2 testified that they were involved for three years and had lived together. During that time, the Mother drank alcohol every day and took a lot of pills. Father 2 also described his involvement in the April altercation. He testified that both his mother and the Boyfriend had called him at work. The Boyfriend threatened to shoot him. Father 2 then went to the Mother's residence, which was next door to the Grandparents' residence. He saw the Boyfriend beating on his mother's car while she stood next to it. Father 2 approached his mother and the Boyfriend tried to kick him. Father 2 pushed the Boyfriend's legs, who then fell to the ground. Father 2 also stated that the Mother smacked him and yelled at him during the altercation. Finally, he admitted to a history of three DUIs.

At the conclusion of the testimony, the court asked the parties to state their respective wishes as to the result. The Mother requested that the children be returned to her based upon her progress. The remainder of the parties requested

that Father 1 and Father 2 each be awarded custody of his respective child. The family court then made an oral finding that, based upon the preponderance of the evidence, it would be in the best interests of the children to grant custody to their fathers. The family court specifically cited the Mother's ongoing lifestyle involving drugs and alcohol over the last five to six years, although it recognized that she was currently doing well. It then awarded custody in accordance with its findings and permitted the Mother to have visitation supervised by the Grandparents. The Mother was also to continue with her treatment plan. The same day, the family court completed an AOC–DNA–9 form for each child, in which it reduced its oral order to a written permanent custody order. In the findings of fact section, the court checked that it had considered several factors contained in Kentucky Revised Statutes (KRS) 403.270, including the wishes of the parents, the wishes of the children, the interaction and interrelationship between the children and the parents, the children's adjustment to their home, school, and community, and the mental and physical health of all involved. The court did not include any additional specific findings in the space provided.

The Mother filed a timely Kentucky Rules of Civil Procedure (CR) 59.05 motion to alter, amend, or vacate the permanent custody orders and requested that the children be returned to her. In support of her motion, the Mother stated that the court could not modify custody on its own motion, noting that no party had filed a motion to modify custody; that the Cabinet was under the duty to make reasonable efforts to return the children to the Mother and utilize preventative and reunification services; that the court failed to consider the protective needs of the children in granting custody to the fathers based upon their admitted criminal or substance abuse histories; and that the court failed to make any written findings of fact supporting its custody determination, making the change in custody improper. By order entered August 25, 2010, the family court denied the Mother's motion to alter, amend, or vacate, but it stated that it would "make a more detailed finding of fact per its oral Order in Court and subsequent written Order." This order did not include any CR 54.02 finality language.

At this point in time, the Mother apparently retained new counsel and was no longer being represented by the attorney who had been appointed to her early in the proceedings. On September 23, 2010, the Mother's new attorney requested the videotaped recordings of the court proceedings and filed a notice of appeal in each case from the August 25, 2010, order denying her motion to alter, amend, or vacate the permanent custody orders entered August 9, 2010. The appeal in Child 1's case was assigned appeal no. 2010–CA–001815–ME, and the appeal in Child 2's case was assigned appeal no. 2010–CA–001787–ME.

On September 28, 2010, the family court entered an order granting the Mother's new attorney's motion for copies of the hearings. That same day, the family court entered another order including detailed findings of fact in relation to the permanent custody ruling and again denied the Mother's motion to alter, amend, or vacate. This order was not served on the Mother's newly retained counsel, but rather was served on her prior appointed counsel. In the order, the family court set forth the procedural history of the matter and detailed the testimony elicited at the permanent custody hearing. The family court specifically stated:

The Court awarded custody to the fathers after the permanency hearing.

Said permanency hearing is required by statute. Both children have a very good relationship with their fathers. The mother has a drug and alcohol problem which has been allowed to continue over several years. The Court was quite concerned with [the Mother's] ability to continue to take care of the children in a drug-free environment. [Child 1] has a very close relationship with her father and in fact spent four weeks out of the summer with him pursuant to Order of this Court, which had been the norm. Further, normal regular visitation was also exercised by [Father 1]. [Child 2] is very close to her paternal grandparents and to her father. Both fathers were deemed appropriate by the Cabinet and the Guardian Ad Litem recommended that both children be placed with the fathers.

In the meantime, the two original appeals were proceeding in this Court. The Court entered orders expediting the appeals and making both appeals confidential. The circuit court clerk then certified the records on November 9, 2010, beginning the briefing time. However, on November 10, this Court issued an order in each case requiring the Mother to show cause why the appeals should not be dismissed as interlocutory. The Mother filed a timely response. By order entered March 7, 2011, a three-judge motion panel of this Court passed the issue concerning whether the appeals were taken from a non-final order to the merits panel for review and permitted the parties to address this issue in their briefs.

Returning to the lower court proceedings, on December 8, 2010, the Mother filed a CR 60.02 motion for relief, stating that her attorney was not served with the September 28, 2010, order, but rather it was served on her previous attorney. Her attorney indicated that she learned of the

entry of the order by reviewing the certification of record on appeal. She requested that the order containing the factual findings be reissued. By order entered December 15, 2010, the family court granted the Mother thirty days to file a notice of appeal, which she did in each case on December 28, 2010. The appeal in Child 1's case was assigned appeal no. 2011–CA–000095–ME, and the appeal in Child 2's case was assigned appeal no. 2011–CA–000091–ME. We shall now consider these four consolidated appeals.

The first issue we shall address is whether the Mother properly appealed from the August 25, 2010, order denying her motion to alter, amend, or vacate and what effect that determination has on the appeals. This question arose as a result of the show cause order issued by this Court, and the parties were directed to argue their respective positions in their briefs. The Mother contends that the order was final and subject to appeal because it denied her post-judgment motion for relief, and the family court lost jurisdiction to enter further findings ten days after its entry by operation of law. However, the Mother also argues in the alternative that her notices of appeal from the August 25th order were premature and would relate forward to the date the order containing the findings of fact was entered, citing *Johnson v. Smith*, 885 S.W.2d 944 (Ky. 1994). Father 1 argues that the August 25th order was not final or appealable because further steps were required to fully adjudicate the rights of the parties; the family court stated that it would be issuing more detailed findings of fact. Father 1 also points out that the family court did not include any language as set forth in CR 54.02 to make the otherwise interlocutory order final and appealable.

CR 54.01 defines a judgment as "a written order of a court adjudicating a claim or

claims in an action or proceeding." The Rule then provides that in order to be final and appealable, a judgment or order must adjudicate "all the rights of all the parties in an action or proceeding, or [be] made final under Rule 54.02." CR 54.02(1), in turn, provides that "[w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may grant a final judgment upon one or more but less than all of the claims or parties only upon a determination that there is no just reason for delay." Unless it adjudicates all of the rights of all of the parties, the judgment must specifically recite these findings or it will be considered interlocutory and not ripe for appeal. *Id.* The August 25, 2010, order did not contain any CR 54.02 finality language.

Here, we are tasked with determining whether the August 25, 2010, order was actually final. In *Hale v. Deaton,* 528 S.W.2d 719 (Ky.1975), the former Court of Appeals addressed the interplay of these rules as well as the need for a final adjudication:

> Before the processes of CR 54.02 may be invoked for the purpose of making an otherwise interlocutory judgment final and appealable, there must be a final adjudication upon one or more of the claims in litigation. The judgment must conclusively determine the rights of the parties in regard to that particular phase of the proceeding.

*Id.* at 722. The Court noted that the order on appeal directing an accounting was corollary to the principal claim; it "did not finally fix the rights of any of the parties but was at the most an intermediate step in the proceeding." *Id.* Furthermore, the trial court stated its intention to make additional findings and enter other orders and judgment. Accordingly, the Court

held that the judgment on appeal was interlocutory, despite "an attempted compliance with CR 54.02." *Id.*

■ Turning to the present appeals, we must agree with Father 1 that the August 25, 2010, order was inherently interlocutory, despite its denial of the motion to alter, amend, or vacate, because of the family court's stated intention to make more detailed findings of fact. And in fact the family court did enter an order in which it made more detailed findings and again denied the Mother's motion to alter, amend, or vacate. Even if the family court had included CR 54.02 finality language, the order at issue still would have remained interlocutory. Therefore, we specifically reject the Mother's argument that the family court lost jurisdiction to enter further findings of fact.

However, we understand the dilemma the Mother faced in whether to commence the appeals when she did or wait for an order that had not yet been entered. Probably the better practice would have been for the family court to rule on the motion to alter, amend, or vacate at the same time it made its further findings of fact. Then the Mother would not have been in a situation where she faced possibly losing the chance to appeal if she had not filed a notice of appeal from the August 25th order and that order had been determined to be final.

■ Our determination that the August 25, 2010, order was not final or appealable does not mean that the Mother's appeals from that order must be dismissed. Rather, we agree with her that those notices of appeal are simply premature and relate forward to the entry of the order containing the more detailed findings of fact entered on September 28, 2010.

The Supreme Court of Kentucky extensively addressed a situation involving a

prematurely filed notice of appeal in its recent opinion of *James v. James*, 313 S.W.3d 17 (Ky.2010):

> As a part of his argument, Appellee also asserts that an appeal filed prematurely to an order allowing it cannot be effective as an appeal or "relate forward" to the later order. It is correct that "[a] rule requiring automatic dismissal for a tardy appeal in civil cases is necessary to provide finality to the trial court's judgment so that the litigant prevailing at the trial level can then execute on the judgment or otherwise enforce the terms of a final order." *Johnson*, 885 S.W.2d at 950. "But the reasons for finality that provide the underpinning for mandating automatic dismissal of a tardy notice of appeal do not adhere to a premature notice of appeal...." *Id.* Certainly, "[t]he federal courts have long construed a notice of appeal filed prematurely as relating forward and filed after entry of judgment." *Id.* at 949; *see also FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.*, 498 U.S. 269, 273, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991) ("The Rule[, FRCP 4(a)(2),] recognizes that, unlike a tardy notice of appeal, certain premature notices do not prejudice the appellee and that the technical defect of prematurity therefore should not be allowed to extinguish an otherwise proper appeal.")

Moreover, in *Board of Regents of Western Kentucky University v. Clark*, 276 S.W.3d 819 (Ky.2009), we upheld the validity of a prematurely filed appeal. Relying upon the reasoning in *FirsTier Mortgage Co.*, and *Johnson*, we pointed out:

> [D]espite the premature nature of these notices, they nonetheless "put appellees on notice of the intent to appeal before expiration of the thirty day time limit in CR 73.02(1)(a), and thus served the essential purpose of

the rule." Furthermore, this Court noted that the particular circumstances of the *Johnson* case—where a litigant could have mistakenly believed that a final judgment had been entered and where the trial court's nonfinal order would be appealable if followed by the formal entry of judgment—suggested that it would not be unreasonable to file a notice of appeal prematurely.

*Id.* at 821. (internal citations omitted) ("Therefore, we hold that as in *Johnson, supra*, Clark's notice of appeal can relate forward to the time when the trial court's interlocutory judgment became final and can be properly heard and decided by the Court of Appeals.") Like *Johnson*, CR 73.02(1)(e)(i) (effective in 2009) now recognizes the validity of prematurely filed notices of appeal and their effectiveness "when an order disposing of the last such remaining motion is entered." Under CR 73.02(1)(e)(i), if the judgment is thereafter altered or amended, or a party intends to challenge a post-judgment order on such motions, he may then file a "notice of appeal, or an amended notice of appeal, within the time prescribed" from the entry date of "the last such remaining motion." CR 73.02(1)(e)(ii). However, if there is no change post-judgment, he does not.

*James*, 313 S.W.3d at 23–24.

As mentioned in *James*, CR 73.02(1) now provides for premature notices of appeal:

> (e) The running of the time for appeal is terminated by a timely motion pursuant to any of the Rules hereinafter enumerated, and the full time for appeal fixed in this Rule commences to run upon entry and service under Rule 77.04(2) of an order granting or denying a motion un-

der Rules 50.02, 52.02 or 59, except when a new trial is granted under Rule 59.

(i) If a party files a notice of appeal after the date of the docket notation of service of the judgment required by CR 77.04(2), but before disposition of any of the motions listed in this rule, the notice of appeal becomes effective when an order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge a post-judgment order listed in this rule, or a judgment altered or amended upon such motion, must file a notice of appeal, or an amended notice of appeal, within the time prescribed by this rule measured by the date of the CR 77.04(2) docket notation regarding service of the order disposing of the last such remaining motion.

The Mother's situation fits squarely into this rule, as she sought relief pursuant to CR 59.05 and filed her notice of appeal before the family court had completely disposed of this motion. Therefore, the first two notices of appeal, while premature, relate forward to the entry of the September 28, 2010, order including the detailed findings of fact.

■ The Mother's next argument addresses whether the family court erred in its rulings entered following the temporary removal and dispositional hearings due to its failure to set forth specific factual findings relative to the children's removal. The Cabinet and Father 1 argue that the Mother failed to preserve this issue by raising the issue before the family court, although the Cabinet went on to argue that the family court made the requisite findings on the form orders entered following the hearings.

Based upon our review of the record, we must agree with the Cabinet and Father 1 that the Mother did not properly preserve

this issue for appeal by first raising it before the family court. "We have long held in Kentucky that an issue not raised in the circuit court may not be presented for the first time on appeal." *Keeton v. Lexington Truck Sales, Inc.*, 275 S.W.3d 723, 726 (Ky.App.2008). "This issue is unpreserved as it is brought up for the first time on appeal. 'It is a matter of fundamental law that the trial court should be given an opportunity to consider an issue, so an appellate court will not review an issue not previously raised in the trial court.'" *Richardson v. Rees*, 283 S.W.3d 257, 265 (Ky.App.2009) (quoting *Marksberry v. Chandler*, 126 S.W.3d 747, 753 (Ky. App.2003)). Even if the issue had been properly preserved, we would nonetheless hold that the family court made adequate findings on the AOC form orders.

■ Next, the Mother argues that the family court erred in conducting a permanent custody hearing. As she did below, the Mother contends that the family court erred by failing to follow the statutory standards in place for modification of custody. We note that while both fathers indicated to the family court at various hearings that they wanted custody of their daughters, neither filed a motion requesting a change in custody.

The family court based its authority to hold a permanent custody hearing on KRS 620.027, which provides as follows:

The District Court has jurisdiction, concurrent with that of the Circuit Court, to determine matters of child custody and visitation in cases that come before the District Court where the need for a permanent placement and custody order is established as set forth in this chapter. The District Court, in making these determinations, shall utilize the provisions of KRS Chapter 403 relating to child custody and visitation. In any

case where the child is actually residing with a grandparent in a stable relationship, the court may recognize the grandparent as having the same standing as a parent for evaluating what custody arrangements are in the best interest of the child.

The Mother contends that this statute does not give the family court authority to hold a permanent custody hearing, but merely provides a jurisdictional basis for the district court to make such decisions. Father 1, on the other hand, points out that this interpretation does not make sense as it would provide district courts with the power to decide custody in KRS Chapter 620 cases, but not afford the same power to family courts. The Cabinet, in turn, suggests that the family court's decision to hold a permanent custody hearing is in line with the requirement set forth in KRS 620.140(1)(c) for dispositional alternatives.

In *B.C. v. B.T.*, 182 S.W.3d 213 (Ky.App. 2005), this Court described the statutory procedure applicable in dependency, neglect, and abuse cases:

> The formalities of filing a dependency, neglect, or abuse action are outlined in KRS 620.070. All juvenile proceedings "shall consist of two (2) distinct hearings, an adjudication and a disposition[.]" In a dependency, neglect, or abuse case, "[t]he adjudication shall determine the truth or falsity of the allegations in the petition and shall be made on the basis of an admission or confession of the child to the court or by the taking of evidence." "The burden of proof shall be upon the complainant, and a determination of dependency, neglect, and abuse shall be made by a preponderance of the evidence." The adjudication, which determines whether a child has in fact been neglected or abused is

considered a trial and the parties have a right to appeal.

Once the family court has determined by a preponderance of the evidence that a minor child is dependant due to neglect or abuse, the family court will hold a separate hearing to determine the temporary removal of the child pursuant to KRS 620.080. "The temporary removal hearing statute's substantive standard strikes the balance between parental rights and child protection by erring on the side of child protection. . . . The focus of a temporary removal hearing is the possibility of harm to the child rather than a determination of the truth or falsity of the dependency, neglect, or abuse petition's allegations" [footnote omitted]. The burden of proof is the same as at the adjudication hearing, i.e., preponderance of the evidence; however, at a temporary removal hearing, hearsay testimony is allowed for good cause. Should the family court decide that the minor child should be removed from the home, it shall issue a temporary custody order stating "the specific reasons for removal and show[ing] that alternative less restrictive placements and services have been considered."

KRS 620.140 provides that continuation in the home must "be contrary to the welfare of the child[.]" This statute seems to indicate that the family court should make reasonable efforts to reunify a child with its family as defined in KRS 620.020(10). However, pursuant to KRS 610.127(7), "[r]easonable efforts as defined in KRS 620.020 shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction determines that the parent has: (7) Other circumstances in existence that make continuation or implementation of reasonable efforts to preserve or reunify the family inconsistent

with the best interests of the child and with the permanency plan for the child." In determining the temporary custody of a child found to be dependant, neglected, or abused, the family court shall make its determination based on the best interests of the child. In determining custody in such a situation, the family court, or a district court "shall utilize the provisions of KRS Chapter 403 relating to child custody and visitation." Once a family court has made a disposition as to the temporary custody placement in a dependency, neglect, or abuse case, "[t]he family, custodian, guardian, legal representative of such child" may move the family court to continue the custody order prior to expiration.

*B.C. v. B.T.*, at 217–19 (footnotes omitted).

■ While nowhere in this procedure is a permanent custody hearing mentioned, we must agree with Father 1 and the Cabinet that such a hearing and an award of custody are not precluded by the structure of KRS Chapter 620, so long as the proper procedures are followed.[1] *See London v. Collins,* 242 S.W.3d 351, 356 (Ky. App.2007) ("if a permanency order in a dependency action brought under Chapter 620 complies with KRS 403.270(2) and is based on the best interests of the child, determined after considering the factors set out in that statute, we ... believe [that] it would qualify as a 'custody decree' and that the requirements of KRS 403.340 would have to be satisfied in order to amend it."). We are mindful, though, of our holding in *S.R. v. J.N.,* 307 S.W.3d 631 (Ky.App.2010), in which we specifically addressed the differences between DNA and custody cases: "The purpose of the dependency, neglect, and abuse statutes is to

provide for the health, safety, and overall well-being of the child. KRS 620.010. It is not to determine custody rights which belong to the parents. A dependency, neglect or abuse adjudication hearing is simply not the appropriate forum for rehashing custody issues." *Id.* at 637.

■ The last issue we must address is whether the family court erred in granting custody to the fathers. What initially gave us some pause in this case was the Mother's testimony that she had custody of her children pursuant to prior custody orders. KRS 403.340 addresses modification of prior custody orders and sets forth the necessary procedural steps to accomplish this, including the filing of a motion and a subsequent hearing before a judge may modify custody. Here, neither father filed an appropriate motion pursuant to that statute in order to invoke the jurisdiction of the family court to modify the prior custody orders, meaning that the family court appears to have decided to modify custody on its own motion. However, the orders mentioned by the Mother are not reflected in the record on appeal, and we have no way to determine what those orders stated, whether one or both were entered out-of-state—and if so, whether the foreign order was registered in Kentucky, or if the orders are even valid. Accordingly, we shall consider the propriety of the family court's ultimate decision to award custody.

■ Our standard of review in the area of child custody is well settled in this Commonwealth. "The party seeking modification of custody or visitation/timesharing is the party who has the burden of bringing the motion before the court" and "the change of custody motion or modifica-

---

1. However, we disagree with the family court's statement that a permanent custody hearing is required under the statute. That does appear to be a misapplication of KRS

620.230, which requires the Cabinet to file a permanency plan when a child is placed in the custody of the Cabinet, a situation that did not happen in the present cases.

tion of visitation/timesharing must be decided in the sound discretion of the trial court." *Pennington v. Marcum*, 266 S.W.3d 759, 769 (Ky.2008). It is also well settled that an appellate court may set aside a lower court's findings:

> only if those findings are clearly erroneous. And, the dispositive question that we must answer, therefore, is whether the trial court's findings of fact are clearly erroneous, i.e., whether or not those findings are supported by substantial evidence. "[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion" and evidence that, when "taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses" because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal," and appellate courts should not disturb trial court findings that are supported by substantial evidence.

*Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (footnotes omitted).

In order to grant permanent custody via a custody decree in a dependency action arising under KRS Chapter 620, the court must comply with the standards set out by the General Assembly in KRS 403.270(2):

> (2) The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. The court shall consider all relevant factors including:
>
> (a) The wishes of the child's parent or parents, and any de facto custodian, as to his custody;
>
> (b) The wishes of the child as to his custodian;
>
> (c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;
>
> (d) The child's adjustment to his home, school, and community;
>
> (e) The mental and physical health of all individuals involved;
>
> (f) Information, records, and evidence of domestic violence as defined in KRS 403.720;
>
> (g) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;
>
> (h) The intent of the parent or parents in placing the child with a de facto custodian; and
>
> (i) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school.

*See London v. Collins, supra.*

After the family court entered the orders awarding permanent custody in August 2010, the Mother moved to alter, amend or vacate those orders, requesting the court to make written findings of fact and conclusions of law supporting the decisions. The court summarily denied the motion shortly thereafter but indicated

that it would issue more detailed findings. The family court did so in its September 28, 2010, order.

After briefly relating the procedural history of the cases, the family court summarized the testimony heard at the August 9, 2010, permanency hearing, including Cabinet workers, the Mother, and both fathers. The court then made the following conclusion:

> .... Both children have a very good relationship with their fathers. The mother has a drug and alcohol problem which has been allowed to continue over several years. The Court was quite concerned with [the Mother's] ability to continue to take care of the children in a drug-free environment. [Child 1] has a very close relationship with her father and in fact spent four weeks out of the summer with him pursuant to Order of this Court, which had been the norm. Further, normal regular visitation was also exercised by [Father 1]. [Child 2] is very close to her paternal grandparents and to her father. Both fathers were deemed appropriate by the Cabinet and the Guardian Ad Litem recommended that both children be placed with the fathers.

We must agree with the Mother that the family court failed to sufficiently consider and make findings related to the factors set forth in KRS 403.270(2). While the family court checked several boxes in its original form orders granting custody to the fathers addressing those factors, the family court did not include any additional findings upon which those rulings were based. The basis for the award of permanent custody appears to be the Mother's drug and alcohol problem along with a determination that each child has a close relationship with her respective father, and in Child 2's case, with her paternal grandparents. There is no separate finding, apart from the pre-printed portion of the form orders, that the custody awards were in the children's best interests. Nor does the family court's ruling take into account the Mother's progress with her case plan or the past legal issues of both fathers. Accordingly, we must remand this case to the family court to properly consider and make sufficient findings regarding the factors contained in KRS 403.270 before reaching a decision as to custody of Child 1 and Child 2.[2]

For the foregoing reasons, the orders of the Greenup Family Court granting permanent custody to the fathers and denying the motions to alter, amend, or vacate are reversed, and these matters are remanded to the family court for further proceedings in accordance with this opinion.

ALL CONCUR.

---

2. We are aware of the Supreme Court of Kentucky's lengthy analysis in *Anderson v. Johnson*, 350 S.W.3d 453 (Ky.2011), of the interplay between CR 54.01 and 54.02 as those rules relate to a party's obligation to request findings on issues essential to a judgment in order to preserve that issue for appellate review. We find it sufficient for preservation purposes that the Mother requested the family court to make findings of fact regarding the custody determinations in her motion to alter, amend or vacate.