RENDERED: FEBRUARY 20, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0562-ME

S.B.                                                         APPELLANT


                     APPEAL FROM WARREN CIRCUIT COURT
v.           HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
                          ACTION NO. 18-J-00642-003


CABINET FOR HEALTH AND
FAMILY SERVICES; B.B.; C.B., A
MINOR CHILD; AND
COMMONWEALTH OF KENTUCKY                   APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; COMBS AND ECKERLE, JUDGES.

ECKERLE, JUDGE: This matter involves juvenile dependency, neglect, and

abuse ("DNA") proceedings in the Warren Family Court. Appellant, S.B.

("Father"), seeks reversal of the denial of his motion for increased visitation and/or

return of custody of his son, Appellee, C.B., a Minor Child ("C.B."). After careful

review, we affirm the Family Court.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The Cabinet for Health and Family Services ("CHFS") filed a DNA petition on April 13, 2022, alleging that C.B. was found at Father's residence with his Mother, Appellee, B.B. ("Mother"), in violation of a domestic violence order ("DVO") that Mother had obtained for herself and on behalf of C.B. The petition claimed that both Father and Mother neglected or abused C.B. The Family Court granted emergency custody to CHFS.[1] Days later, on April 15, 2022, the Family Court held a temporary removal hearing[2] at which CHFS employee Teatra Davis testified that she had worked with the family since late 2021. She said that, prior to the filing of the DNA petition, Father had a case plan, which he did not follow. The Family Court ultimately continued the removal temporarily, maintained custody of C.B. with CHFS, and set the matter for adjudication in June of 2022.

At the conclusion of the adjudication hearing,[3] the Family Court made a finding of neglect or abuse regarding Father due to violation of the DVO, concluding, in part, that Father entered guilty pleas in District Court to violation of the DVO on four separate occasions, including the date that the DNA petition was

---

[1] Mother has not appealed any order of the Family Court.

[2] Father appeared without counsel. At the outset of the hearing, the Family Court informed Father of his rights, including the right to counsel if he could not afford one, and offered the necessary paperwork. Father did not request counsel at that time, and the hearing continued.

[3] Father again appeared without counsel.

filed. The Family Court noted the case plan, which is in the record and dated June 15, 2022. Pursuant to this plan and Family Court order, Father was required to refrain from any telephone calls or visits with C.B. and to complete various tasks, including, but not limited, to the following: (1) compliance with the DVO and all Court orders; (2) completion of a mental health assessment and all recommended actions; (3) finishing successfully an anger management/domestic violence assessment and all recommended actions; and (4) execution of signed releases of information for all of Father's providers.

Two months later on August 17, 2022, the Family Court held a dispositional hearing[4] and instructed Father to continue to work through his case plan. The Family Court's order, entered August 25, 2022, provided, in relevant part, "[a]ll parties shall comply with CHFS, Court Orders, and service provider recommendations . . . . Visitation shall be at CHFS['] discretion in consult with [C.B.'s] therapist . . . . Family therapy shall occur if and as recommended by [C.B.'s] therapist; Parents shall sign necessary releases for therapists to communicate." Father did not appeal the disposition order.

---

[4] Father appeared without counsel again. He was in custody and had been transported from incarceration. He requested a public defender and completed an affidavit of indigency. The Family Court approved Father's affidavit of indigency and request for appointment of counsel in writing five days after entry of the disposition order.

The record before us indicates that Father worked on his case plan and provided proof of services. However, according to the permanency order entered on April 11, 2023 – some eight months after the dispositional hearing – CHFS had still not allowed Father visitation with C.B. in the one year that the DNA action had been pending.

On September 2, 2023, CHFS filed a petition in a separate action to terminate Father's parental rights ("TPR"). *See* Warren Circuit Court Case No. 23-AD-00108. CHFS' September 13, 2023, review report indicates that Father refused to sign a necessary release to enable CHFS to communicate with his providers. CHFS requested that the Family Court order the permanency goal be changed from "return to parent" to "adoption." CHFS also provided a letter from C.B.'s therapist that detailed C.B.'s trauma and his fear of Father. On September 28, 2023, the Family Court issued a review order that not only reiterated the requirements for Father that had been in the dispositional order, but also ordered Father to undergo a parental capacity analysis and a Comprehensive Assessment and Training Services ("CATS") evaluation through the University of Kentucky.

The time at which CHFS, or more particularly, the Family Court, permitted Father to begin supervised visitation with C.B. is unclear from the record before us. We do know that on October 13, 2023, Father filed a motion for increased visitation, asserting that he was compliant with his case plan. It does not

-4-

appear that the Family Court ruled on the motion. On October 21, 2023, a parental evaluation for Father was filed with the Family Court. Therein, the evaluator found no specific parenting concerns for Father but indicated that Father unrealistically presented himself as being free from any negative characteristics.

Five months later, on March 12, 2024, the Family Court issued an order that changed C.B.'s permanency goal to adoption. The Family Court noted that CHFS had been unable to perform a successful home visit with Father, and that Father had continued to refuse to sign forms of release enabling CHFS to communicate with his providers, including his therapist. The Family Court permitted Father to engage in ongoing, supervised, therapeutic visits with C.B., and it ordered CHFS to conduct regular, random visits to Father's home.

Some six weeks later, per a report filed by CHFS on April 24, 2024, two home visits were completed. C.B.'s therapist submitted a letter to the Family Court dated April 27, 2024, indicating that she had been having disagreements with Father during therapeutic visits, and that C.B. demonstrated maladaptive and inappropriate behavior after visits with Father. C.B., who was seven years old at that time, indicated that he did not want increased visitation or weekend visits with Father.

The record before us contains a letter from the CATS team dated August 20, 2024. The letter indicates that CATS would not provide an evaluation

for Father because, in relevant part, "maltreatment evaluation protocol is preferred for cases where the [permanency] goal remains return to parent and there is a realistic pathway for reunification . . . ." On August 21, 2024, Father filed another motion for increased visitation with C.B. The Family Court delayed action on that motion.

Months later, C.B.'s therapist submitted another letter to the Family Court on October 9, 2024, indicating that family therapy had been ineffective, and Father was uncooperative. CHFS again suspended Father's visitation. Ongoing attempts were made to find a family therapist outside of the facility to provide individual therapy to C.B.

On December 19, 2024, the Family Court heard Father's August motion for increased visitation. The only witness to testify was Trudy Kapley ("Kapley"), who had been C.B.'s therapist for approximately nine months at that time. Father had one other prior therapist. Kapley detailed Father's lack of cooperation and resistance to therapy. She testified that she had trouble persuading Father to sign a release to enable her to communicate with his therapist and, although he eventually signed it, he nevertheless instructed his therapist not to release records. She also testified that C.B. reported that he feared Father, and that Father had whipped him with a belt. Kapley recommended Father's visitation occur no more than once per month in a therapeutic setting.

The Family Court conducted a second hearing approximately three months later, on March 5, 2025. The only witness was social worker, Emily Carter ("Carter"), who testified that there were four other social workers assigned to the family previously, and that she had taken over the case in October of 2024. She reinforced Kapley's testimony that Father refused to sign releases. Carter also implied that CHFS had reason to believe that Father had again violated the DVO by sending text messages to Mother, even though criminal charges had not been filed. Carter acknowledged that Father had completed most of his case plan, except ongoing family therapy, but she was concerned about escalation in C.B.'s aggressive behaviors after visits with Father. She acknowledged that Father attended every scheduled visit and was appropriate during his time with C.B. Carter testified that CHFS had been working to find a family therapy provider since January of 2025, but had been unsuccessful. Finally, she opined that, except for family therapy, Father did not need any other services at that time.

The Family Court ultimately denied Father's motion. It concluded that a return of custody to Father or an increase in visitation was not in C.B.'s best interest. The Family Court focused on Father's lack of cooperation with C.B.'s therapy, including his refusal to sign releases. It is from this order that Father appeals.

We note that, at the time of this writing, the DNA case has been pending before the Family Court for nearly four years, and C.B. has been in foster care, under custody of CHFS, for the duration. As of March 2025, he was in his third foster home. The TPR proceeding, which is not before us, remains unadjudicated.

## II. STANDARD OF REVIEW

Generally,

> [a] family court's findings of fact in a DNA action shall not be set aside unless clearly erroneous. A finding of fact is clearly erroneous if it is not supported by substantial evidence, which is evidence sufficient to induce conviction in the mind of a reasonable person. If the family court's findings of fact were supported by substantial evidence, and it applied the correct law, its decision will not be disturbed absent an abuse of discretion. An abuse of discretion occurs when the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*A.S. v. M.R.*, 694 S.W.3d 403, 408–09 (Ky. App. 2024) (quoting *M.C. v. Cabinet for Health & Fam. Servs.*, 614 S.W.3d 915, 921 (Ky. 2021) (internal quotation marks and citations omitted)). However, as explained *infra,* we review this matter for palpable error only.

## III. ANALYSIS

We begin by noting that CHFS failed to file a brief in this appeal. When an appellee fails to file a brief, our options are to "(a) accept the appellant's statement of the facts and issues as correct; (b) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (c) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case." Kentucky Rule of Appellate Procedure ("RAP") 31(H)(3). However, in *Ellis v. Ellis*, 420 S.W.3d 528 (Ky. App. 2014), this Court reiterated that an appellee's failure to file a brief should not be taken as a confession of error in cases involving child custody or support. *Id.* at 529. Accordingly, we will not allow CHFS' briefing failures to dictate an outcome contrary to the best interests of a child. We caution CHFS that sanctions may warranted for this type of inaction in the future, particularly when a case has languished in Family Court for years, as this one has, without permanency being achieved for the child at issue.

We must also note Father's briefing deficiencies. In contravention of RAP 32(A)(3), he provides no citations to the record in his Statement of the Case. In contravention of RAP 32(A)(4), Father fails to provide preservation statements at the beginning of his arguments, and he provides no citations to the voluminous, years-long, paper record. We acknowledge that Father provides some citations to the hearings that occurred on December 19, 2024, and March 5, 2025. This Court

has three options when a party fails to follow the mandates of the RAP: ignore the deficiency; strike the brief in whole or in part; or review only for manifest injustice.[5] *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021); *see also* RAP 31(H)(1) which states that this Court may strike a brief "for failure to substantially comply with the requirements of these rules."

In the case *sub judice*, we choose to review for manifest injustice only in large part due to the inadequate briefing. But we also do so because C.B. has languished in foster care for nearly four years while neither Father nor CHFS has adopted any sense of urgency to see that permanency is achieved for this child. For every refusal of Father to cooperate, and for every new case worker, new therapist, new foster home, change in visitation, and additional task CHFS added to Father's case plan, C.B. has been left in limbo. In other words, we proceed with review not for the benefit of Father or CHFS, but rather in spite of their shortfalls, and solely for the sake of C.B. in an effort to reduce any further harm than that already and clearly inflicted.

Turning now to the merits, Father raises numerous arguments on appeal. To wit, he claims that: (1) the findings of the Family Court were

---

[5] The manifest-injustice standard of review is reserved only for errors in appellate briefing related to the statement of preservation; if a party fails to inform the Appellate Court of where in the record his issue is preserved, the Court can treat that issue as unpreserved. *Ford*, 628 S.W.3d at 155.

erroneous and not based on substantial evidence; (2) denial of visitation lacked a finding of serious endangerment in violation of Kentucky Revised Statute ("KRS") 403.320; (3) reliance on therapeutic and administrative delays, constructively suspending Father's parental rights was unjustified; (4) neglecting to address the detrimental impact of prolonged delay in family therapy was erroneous; (5) CHFS' continually additions of tasks to Father's case plan lacked substantial grounds; (6) failing to acknowledge Father's compliance with his case plan was improper; (7) denial of visitation for extended periods based on therapists' scheduling was unwarranted; (8) violations of Father's constitutional rights and right to procedural due process occurred; (9) permitting Kapley to testify as an expert witness despite her own admissions that she lacked sufficient information and qualifications under KRS 600.020(11) amounted to an abuse of discretion; and (10) violations of CHFS' policy undermined reunification between Father and C.B.

Most of Father's arguments revolve around what he contends were erroneous findings by the Family Court. We are unpersuaded by Father's central assertion that the Family Court's findings were erroneous. Father's case plan from June of 2022 required him to sign releases of information for all providers. The Family Court reiterated that same requirement in subsequent orders, including the disposition order entered on August 25, 2022, which required, in relevant part, "[a]ll parties shall comply with CHFS, Court Orders, and service provider

-11-

recommendations . . . Visitation shall be at CHFS['] discretion in consult with [C.B.'s] therapist . . . . Family therapy shall occur if and as recommended by [C.B.'s] therapist; Parents shall sign necessary releases for therapists to communicate." As stated previously, Father did not appeal the disposition order. "[A] disposition order, not an adjudication order, is the final appealable order with regard to a decision of whether a child is dependent, neglected, or abused." *M.C. v. Cabinet for Health and Family Services*, 614 S.W.3d 915, 921 (Ky. 2021) (internal quotation marks and citation omitted). The same requirements appear in the general review order entered December 1, 2022, and the permanency order entered on April 11, 2023.

In other words, the requirements that Father sign releases and participate in family therapy have been ongoing throughout the proceedings. Father continually refused to sign releases for an extended period; when he finally signed one, he nevertheless and contrarily instructed his therapist to refrain from cooperating with C.B.'s therapist. While we recognize there was a delay in finding a family therapist outside of the facility that treats C.B., that delay is minimal (approximately three months at the time of the hearing conducted on March 5, 2025) compared to the delay caused by Father's refusal to follow the Family Court's orders over the span of several years. Accordingly, we cannot say the Family Court's findings are palpably erroneous.

-12-

We now turn to what Father claims were misapplications of the law by the Family Court. Father first cites to KRS 403.320. Generally, KRS Chapter 403 pertains to dissolution of marriage and child custody proceedings. DNA proceedings, on the other hand, are governed by KRS Chapters 610 and 620. "The purpose of the dependency, neglect, and abuse statutes is to provide for the health, safety, and overall well-being of the child. KRS 620.010. It is not to determine custody rights which belong to the parents." *N.L. v. W.F.*, 368 S.W.3d 136, 147 (Ky. App. 2012). The best interest of the child is of paramount concern in a DNA action. *G.M.A. v. Commonwealth*, 689 S.W.3d 142, 148 (Ky. App. 2024). However, "[i]n determining custody in [DNA proceedings], the family court, or a district court shall utilize the provisions of KRS Chapter 403 relating to child custody and visitation." *B.C. v. B.T.*, 182 S.W.3d 213, 218–19 (Ky. App. 2005) (internal quotation marks and footnotes omitted). Specifically, Courts should look to KRS 403.270(2) for guidance. *Id.* The statute provides, in relevant part, as follows:

> (2) The court shall determine custody in accordance with the best interests of the child[,] and equal consideration shall be given to each parent and to any de facto custodian. Subject to KRS 403.315, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is

-13-

consistent with ensuring the child's welfare. The court shall consider all relevant factors including:

> (a) The wishes of the child's parent or parents, and any de facto custodian, as to his or her custody;

> (b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent or de facto custodian may have over the child's wishes;

> (c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;

> (d) The motivation of the adults participating in the custody proceeding;

> (e) The child's adjustment and continuing proximity to his or her home, school, and community;

> (f) The mental and physical health of all individuals involved;

> (g) **A finding by the court that domestic violence and abuse, as defined in KRS 403.720, has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program**[.]

(Emphasis added.)

However, in Father's argument on this point, he fails to address KRS 403.270(2) and instead argues the Family Court failed to consider KRS 403.320(1) and (3), which provide the following:

> (1) A parent not granted custody of the child and not awarded shared parenting time under the presumption specified in KRS 403.270(2), 403.280(2), or 403.340(5) is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health. Upon request of either party, the court shall issue orders which are specific as to the frequency, timing, duration, conditions, and method of scheduling visitation and which reflect the development age of the child.
>
> . . . .
>
> (3) The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health.

The problem with Father's citations lies in his failing to present any meaningful connection in his argument that KRS 403.320 is applicable to the instant action, or to *any* DNA proceeding. KRS 403.270(2)(g) permits the Family Court to consider domestic violence when evaluating the best interests of the child. To that end, the Family Court in the instant action made a finding of neglect or abuse due to

-15-

domestic violence in the home. A DVO was entered to protect both Mother and C.B. from Father. Although the DVO is not included in the record before us, Mother apparently received custody of C.B. as a result of the DVO, and she retained custody until the DNA petition was filed. Father pleaded guilty to violations of the DVO on at least four occasions. *See* adjudication order, entered June 7, 2022. Father's protestation that there was never any documented threat to C.B. lacks factual support. The disposition order mandated that Father meet certain obligations as described *supra.*[6] Any increase in Father's visitation and/or a change in custody within the context of the DNA action depended upon successful completion of the requirements ordered by the Family Court in conjunction with consideration of the best interests of C.B. Father complied with many requirements, but not all of them. Significantly, he continued to refuse to participate meaningfully and cooperatively in family therapy or sign the non-optional releases. Accordingly, we discern no error, palpable or otherwise, in the Family Court's orders, which were based upon the substantial evidence.

Father next asserts that the Family Court erred in allowing Kapley to testify as an expert witness because she allegedly lacked the necessary

---

[6] *See M.C. v. Cabinet for Health and Family Services*, 614 S.W.3d 915, 920–21 (Ky. 2021) (internal quotation marks, citations, and footnotes omitted).

qualifications pursuant to KRS 600.020(52). We find this under-developed contention unsupported as well.

A review of the December 19, 2024, hearing shows that Father himself called Kapley as a witness. Kapley listed her professional qualifications upon Father's questioning. She testified that she has been a clinical therapist since 2017, and she has a master's degree in counseling. She also discussed her continuing education requirements. In the midst of Kapley's testimony, Father asked the Family Court to decline to recognize her as an expert witness. But at that point, no one had motioned to qualify her as such. The Family Court did not specifically rule on the issue until opposing counsel questioned her, and Father again objected. The Family Court then allowed Kapley to give her expert opinion on the physical placement of C.B. Video Record ("VR") 12/19/24 at 10:15:40. In doing so, Kapley testified that she recommended against permanent custody of C.B. with Father.

KRS 600.020 provides definitions for KRS Chapters 600 – 645. Therein, KRS 600.020(52)(a)–(h) provides all of the varying qualifications a person may have to be considered a "qualified mental health professional." Father fails to identify which qualification in the extensive list provided by the statute he believes Kapley failed to meet. "It is not our function as an appellate court to

research and construct a party's legal arguments[.]" *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005). Further,

> [w]e will not search the record to construct Appellants' argument for them, nor will we go on a fishing expedition to find support for their underdeveloped argument. "Even when briefs have been filed, a reviewing court will generally confine itself to errors pointed out in the briefs and will not search the record for errors." *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979) (citation omitted).

*Jones by and through Jones v. IC Bus, L.L.C.*, 626 S.W.3d 661, 686 (Ky. App. 2020).

Father also points out the Family Court did not conduct a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), regarding Kapley's qualifications as an expert. Importantly, we begin by noting that, based on the record before us, Father did not request a *Daubert* hearing, and in another of his briefing failings, he did not point us to a preservation statement or place in the record where he allegedly did. Further, and more importantly for this appeal, is that "the failure to conduct a *Daubert* review does not amount to palpable error[.]" *Davis v. Commonwealth*, 147 S.W.3d 709, 728 (Ky. 2004) (citation omitted).

Finally, Kapley's opinion regarding placement of C.B. was only a small portion of her testimony. She also detailed Father's lack of cooperation with therapy, including inappropriate statements in the presence of C.B., and Father's

-18-

failure to allow communication with his therapist, even after he finally signed the necessary release forms. Kapley detailed aggressive and inappropriate behavior displayed by C.B. in both anticipation of visits with Father and post-visit occurrences. She also detailed the trauma experienced by C.B. in response to domestic violence between Mother and Father. Kapley's testimony was not refuted by Father, who did not testify or offer any other evidence on this point. Accordingly, we discern no error regarding the Family Court's reliance on Kapley's testimony, nor its decision to recognize her as an expert witness, given her education and experience. The admission of her expert opinion testimony was not erroneous, and it remained within the Family Court's discretion to assign that testimony an appropriate weight.

We are not without sympathy for Father's assertion that CHFS essentially kept moving the goalposts by adding new assignments to his case plan after he completed others. For example, the CATS assessment and parental capacity assessment were not requested and ordered until September 28, 2023, or 17 months after the petition was filed. Father immediately obtained his parental capacity assessment. However, nearly another year passed before the CATS team responded that it would not conduct the assessment because the permanency goal had been changed to adoption. Based on the record before us, Father's lack of cooperation is as much a contributing factor to the stagnancy of this case as is

inaction by CHFS.  Nevertheless, we discern no palpable error in the Family Court's decision to deny Father's motion for increased visitation and/or return of C.B. to his custody.  An earlier appeal and proper briefing might have aided Father here.[7]  But the paramount consideration here is the best interest of the child, and the Family Court adhered to that standard in its rulings.

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the Warren Family Court is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:                    NO APPELLEE BRIEF FILED.

Carlos D. Bailey
Bowling Green, Kentucky

---

[7] We realize that current counsel was not involved in the beginning stages of this case.