Steven Hunter LONDON, Appellant

v.

Latonya COLLINS, Appellee.

No. 2007–CA–000529–ME.

Court of Appeals of Kentucky.

Nov. 30, 2007.

John Allen Taylor, Louisville, KY, for appellant.

James C. Nicholson, Louisville, KY, for appellee.

Before HOWARD, NICKELL and TAYLOR, Judges.

HOWARD, Judge.

Appellant, Steven Hunter London (hereinafter Steven), appeals from an order of the Jefferson Family Court, entered February 27, 2007, denying his petition for custody of his biological daughter, J.T. Because we conclude that, on the facts of this case, an order of permanent custody entered in a previous dependency action was not a "custody decree" as envisioned by KRS Chapter 403, so that the requirements of KRS 403.340(2) to modify custody would apply, and that the trial court erred in finding that the appellee was a de facto custodian without a sufficient evidentiary record, we vacate the February 27, 2007, order and remand.

J.T. is the biological daughter of Steven and Re'Shae Todd (hereinafter Re'Shae). When J.T. was born, both Steven and Re'Shae were teenagers. The child resided with Re'Shae and they primarily resided with Re'Shae's grandmother, Ginny Todd. Steven attended college and later took a job that required extensive travel. In December 2004, a dependency, abuse and neglect action was instituted against

Re'Shae.[1] Steven was contacted and appeared for the temporary removal hearing on December 22, 2004. At that time he agreed that it was in J.T.'s best interest that Re'Shae's cousin, LaTonya Collins (hereinafter LaTonya), take temporary custody of J.T. He had not spent much time with J.T. prior to that date and he was single, traveled extensively for his job and had two male roommates.

The next court date was set for February 23, 2005, (hereinafter the 2005 hearing). The Family Court docket reflects that the case was set for a pretrial conference. However, in January, 2005, approximately one month before that hearing, the mother, Re'Shae, died. At the hearing the Family Court acknowledged Re'Shae's death and questioned whether further proceedings could be held without notice to the fathers.[2] The social worker advised the court that J.T.'s father was present and that he had agreed that LaTonya should have permanent custody. Accepting that statement and without hearing any evidence, the Court signed an order awarding permanent custody to LaTonya, pursuant to KRS 620.027. Significantly, Steven was not represented by counsel at that hearing, was not advised of his right to counsel or of his rights as a parent to custody of his child, nor was he questioned by the court as to whether or not he agreed to the award of permanent custody. In fact, he never spoke at that hearing at all.

After the 2005 hearing, Steven started spending more and more time with J.T. and at the time he filed his petition for custody, he was married, had stopped traveling extensively for his job and, according to both him and LaTonya, was caring for J.T. approximately 49% of the time.

On January 11, 2006, Steven filed a motion in the dependency action to modify the custody order. He remanded the motion on February 2, 2006,[3] and then filed a separate petition for custody on February 24, 2006. In the petition he claimed that he had informally agreed with LaTonya that when he discontinued traveling and established a permanent home for J.T., the informal custody arrangement would be modified; that there was a substantial change in the circumstances of the parties; and that it was in the best interests of J.T. that the order for permanent custody be modified and that he be granted custody. In her response, LaTonya disputed the reason for the placement, stating that J.T. was placed with her because Steven had no relationship with J.T. and had made little or no effort to visit her since her birth, until that time. LaTonya further denied that the best interests of J.T. would be served by the award of custody to Steven.

The matter came on for hearing on November 30, 2006, at which hearing Steven, LaTonya and Ginny Todd all testified. Steven testified that he understood the 2005 hearing was to continue temporary custody with LaTonya but that he did not understand that it was to consider perma-

1. Because the complete record of the dependency action is not before this Court, the circumstances under which the petition was brought are not completely clear. However, those facts are not necessary to a determination of the issues on this appeal.

2. Another of Re'Shae's children was also the subject of the dependency action. Steven was not the father of that child. Apparently nei-

ther of the fathers had been noticed for that hearing, although Stephen was present.

3. Steven maintains that he was informally advised by the court that he could not pursue custody of J.T. in the dependency action, but was required to file a separate petition for custody. The record neither supports nor refutes that assertion.

nent custody. LaTonya testified that she understood that the hearing was for permanent custody because the social worker had explained that to her prior to the hearing. She also testified that when she inquired of the social worker whether Steven had agreed for her to have "sole" custody, the social worker stated that Steven had indicated that he wanted "joint" custody with LaTonya but that she (the social worker) thought it was in J.T.'s best interests for LaTonya to have sole custody. Before ruling on Steven's petition for custody, the Family Court continued the hearing to allow the parties to depose the social worker. However, that deposition was never taken. Steven instead filed a motion to submit the case for a decision.

The Family Court entered its order on February 27, 2007, finding that LaTonya was a de facto custodian pursuant to KRS 403.270(1)(a) and that, pursuant to KRS 403.270(1)(b), she had equal standing with Steven in custody matters regarding J.T. The Court then found that, because less than two years had passed since the February 23, 2005, permanency order[4] and Steven presented no evidence that J.T. might be harmed by her present environment, he had failed to meet the statutory requirements of KRS 403.340 to modify custody. The Court also found that Steven's failure to object at the 2005 hearing precluded his claim that he did not agree to the grant of permanent custody to LaTonya. The Court ordered that LaTonya should retain permanent custody of J.T. It is from this order that Steven appeals.

On appeal, Steven disputes the findings by the Family Court that he was present at the 2005 hearing, or that any hearing was held before the award of permanent custody; that the parties ever agreed that LaTonya would have permanent custody of J.T.; or that LaTonya was the de facto custodian of J.T.

Findings of fact may be set aside only if they are clearly erroneous. CR 52.01. Whether or not the findings are clearly erroneous depends on whether there is substantial evidence in the record to support them. CR 52.01; *Reichle v. Reichle,* 719 S.W.2d 442, 444 (Ky.1986). If the findings are supported by substantial evidence, then appellate review is limited to whether the facts support the legal conclusions made by the finder of fact. The legal conclusions are reviewed *de novo. Brewick v. Brewick,* 121 S.W.3d 524, 526 (Ky.App.2003). Finally, if the factual findings are not clearly erroneous and the legal conclusions are correct, the only remaining question on appeal is whether the trial court abused its discretion in applying the law to the facts. *B.C. v. B. T.,* 182 S.W.3d 213, 219 (Ky.App.2005).

We first address Steven's argument that he was not present at the 2005 hearing, when the order granting permanent custody to LaTonya was entered.[5] Although he apparently had no formal notice of that hearing, a review of the video record supports the Family Court's finding that Steven was present. However, given the circumstances surrounding the proceedings, as set out below, it appears quite likely

---

4. By the time this order was entered, just more than two years had passed, from February 23, 2005 to February 27, 2007. However, if the requirements of KRS 403.340 for modification of a custody decree applied, the critical date would be that of the filing of Steven's Petition for Custody, February 24, 2006, and the court was correct in applying the more

stringent requirements for motions to modify custody decrees less than two years old.

5. At oral argument, Steven's counsel conceded that the record reflects that he was present at this hearing, although he took no active part.

that Steven may not have understood what went on at that hearing.

We next turn to what we see as the primary issue in this case, the Family Court's finding that Steven's petition for custody should be treated as a motion to amend a previous custody decree, under KRS 403.340, and that Steven's failure to present evidence that J.T. would be harmed if she remained in her present environment was fatal to that petition. KRS 403.340(2) provides,

No motion to modify a custody decree shall be made earlier than two (2) years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe that:

(a) The child's present environment may endanger seriously his physical, mental, moral, or emotional health; or

(b) The custodian appointed under the prior decree has placed the child with a de facto custodian.

If KRS § 403.340 is applicable, then KRS § 403.350, which requires a motion to modify a custody decree to be supported by affidavits setting forth facts supporting the motion, is also applicable. Appellant's failure to file the supporting affidavits would itself be fatal to his petition, as the Family Court would not have the authority to consider his motion to modify custody. *Robinson v. Robinson,* 211 S.W.3d 63 (Ky. App.2006).

■ The essential question then is whether the 2005 order of permanent custody in the dependency action was a "custody decree" as envisioned by KRS Chapter 403 so that the procedural requirements of KRS 403.340 for modification would apply. We hold that, under the unique circumstances of this case, the 2005 order was not such a custody decree.

We first note that Chapter 620 of the Unified Juvenile Code is only applicable to children who are alleged to be dependent, neglected and abused, with the express purpose, according to KRS 620.010, of protecting their fundamental rights, including but not limited to,

adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family.

However, KRS 620.100 also provides significant protections of the parent's superior right to custody. Thus, a Court considering such an action is required to advise the parent or other person exercising custodial control of his right to appointment of counsel. If the parent is unable to afford counsel pursuant to KRS Chapter 31, the Court is required to appoint counsel. During the proceedings a permanency plan for the child is developed with the goal either of returning the child to the parent or for the termination of parental rights. Steven was unrepresented in the dependency action and it does not appear that he was ever advised of these rights. Neither does it appear that any permanency plan was developed, either to "return" J.T. to Steven or to terminate his parental rights.[6]

KRS Chapter 403 applies specifically to actions for dissolution of marriage and child custody issues in that context. However, its custody provisions are also referenced by various other sections of the Kentucky Revised Statutes, including Chapter 620, as will be discussed below.

**6.** There is nothing in the record suggesting that there were ever any grounds for termi-

nating Steven's parental rights, under KRS 625.090.

The stated purpose of Chapter 403 as it relates to the custody of children is to "[m]itigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage." KRS 403.110(3).

Before a custody decree is entered the trial court must determine what custody arrangement will be "in accordance with the best interests of the child." KRS 403.270(2). In order for the Court to consider the child's best interests, the parties, including any de facto custodian, are given a meaningful opportunity to be heard. KRS 403.270(2) also sets out nine specific factors which the court must consider in determining the best interests of the child. Once these proceedings are concluded and a "custody decree" is entered, KRS 403.340 allows for modification only under very limited circumstances. The obvious intent of the time and pleading requirements of KRS 403.340 and 403.350 is to prevent continuing litigation of custody after the issues have been fairly concluded between the parties. *Quisenberry v. Quisenberry*, 785 S.W.2d 485, 488 (Ky.1990) (superceded on other grounds by 2001 Ky. Acts Ch. 161, Sec. 2).

While this appears to be a question of first impression in Kentucky, we believe that for a custody order to be a "custody decree," within the meaning of KRS Chapter 403, it must be based on the standards set out in KRS 403.270(2). A permanency order in a dependency action, under KRS Chapter 620, can and ordinarily should satisfy this requirement. KRS 620.027 provides,

> The District Court has jurisdiction, concurrent with that of Circuit Court, to determine matters of child custody and visitation in cases that come before the District Court where the need for a permanent placement and custody order is established as set forth in this chap-

ter. The District Court [or Family Court], in making these determinations, shall utilize the provisions of KRS Chapter 403 relating to child custody and visitation. . . .

Therefore, if a permanency order in a dependency action brought under Chapter 620 complies with KRS 403.270(2) and is based on the best interests of the child, determined after considering the factors set out in that statute, we that believe it would qualify as a "custody decree" and that the requirements of KRS 403.340 would have to be satisfied in order to amend it. However, while the February 23, 2005, permanency order in this case recites that it is based on KRS 403.270(2) findings, it is clear that this was not, in fact, the case.

The dependency action in this matter was instituted against Re'Shae, and not against Steven. There was no allegation of any action Steven had taken or not taken with regard to J.T. He was not appointed counsel. There is no indication that he was advised either of his right to counsel or of the fact that he could be waiving his superior right to custody of J.T. by allowing for placement with LaTonya. Indeed, the order of permanent custody does not even recognize that Steven was in attendance or ever mention him. It specifically states that notice to the parents was not provided because "mother is deceased." Apparently because the court believed that the parties had agreed to the placement with LaTonya, there was no evidence taken, let alone that required to make the findings necessary to support an award of custody pursuant to KRS 403.270.

The February 23, 2005, order, entered on AOC form DNA–9, recited, in the language of the form, that it was based upon "the length of time the child has been in the care of *LaTonya Collins;* the exis-

tence of a stable custodial relationship; the current ability of the parent(s) to provide for the child; need for permanency for the child, and the following factors required by KRS 403.270 (check all that apply)." Checked by the court were, "interaction and interrelationship of the child with parent(s), siblings, and anyone else who may significantly effect the child's best interests;" "child's adjustment to his/her home, school and community;" and "mental and physical health of all individuals involved." However, there was no evidence taken at this hearing upon which such findings could have been based. The permanency order appears, in fact, to have been based solely on the social worker's unsworn statement that the parties had agreed that permanent custody be given to LaTonya. Even that statement is now called into question by LaTonya's testimony that the social worker told her at that same time that Steven wanted joint custody, but that it was her opinion that awarding sole custody to LaTonya was in J.T.'s best interests.

We are further convinced by the fact the 2005 hearing was not noticed as a custody hearing or a hearing to determine the permanent placement of J.T., but as a "pretrial conference;" that Steven was not questioned by the court as to his understanding of the custody "agreement;" and that LaTonya had not filed any petition for custody of J.T. Indeed, she would not have had standing to do so, as the hearing took place less than two months after J.T. was temporarily placed in her home, following the temporary removal hearing. She clearly was not yet a "de facto custodian," pursuant to KRS 403.270(1).

As such, we hold that the February 23, 2005, permanency order in question in this case was not a "custody decree" within the meaning of KRS Chapter 403 and that the requirements of KRS 403.340 for modifica-

tion of a custody decree are inapplicable. Therefore, the Family Court was required to consider Steven's petition for custody as if there had been no prior custody determination.

The Family Court also concluded that the order giving permanent custody of J.T. to LaTonya should not be disturbed because Steven was present at the February 23, 2005, hearing but failed to object to the social worker's representation to the Court that the parties agreed that LaTonya should have permanent custody. Implicit in this holding is a finding that, by failing to object, Steven *waived* his superior right, as a parent, to custody of J.T., at the 2005 hearing.

■ The Courts of the Commonwealth have consistently recognized a parent's superior right to the care and custody of his biological children and that he has a fundamental, basic and constitutionally protected right to raise his own children. *Moore v. Asente*, 110 S.W.3d 336 (Ky.2003). Clearly, it is possible for a biological parent to relinquish or waive that superior right to custody. But it should not happen by accident, without the parent understanding or being advised what he is giving up, or without a specific finding by the court that such a waiver has occurred. In *Moore*, the Kentucky Supreme Court established the factors to be considered in determining whether such a waiver has occurred:

In determining whether parents have relinquished "physical custody" in a manner that confers standing upon a nonparent, Kentucky trial courts-like other courts that have addressed this issue-should consider, among other factors: (1) how possession of the child was acquired by the nonparent, especially the intent of the parents at the time of their relinquishment of the child to the nonparent; (2) the nature and duration

of the possession by the nonparent; (3) the age of the child when possession was acquired by the nonparent and the child's age when the parents sought the child's return; (4) any visits by the parents during the nonparent's possession of the child; (5) any financial support by the parents during the child's stay with the nonparent; (6) the length of time between the relinquishment and the parent's efforts to secure the child's return; and (7) what efforts the parents made to secure the child's return. Although we recognize that these factors cannot be applied mechanically as a formula to generate a conclusive answer as to the nonparent's standing, we believe these factors are useful analytical tools. We further recognize that although factors (1) and (2) will usually have the most importance, the other factors may also impact upon the determination.

*Id.* 110 S.W.3d at 358–359.

■ Steven has consistently maintained that he and LaTonya agreed only to a temporary custody arrangement and that once the circumstances changed the arrangement was to be modified. We find nothing in LaTonya's testimony that refutes that assertion. Given Steven's circumstances and Re'Shea's very recent death, it seems reasonable to conclude that the parties may have agreed in 2005, that the child should be placed with a close relative temporarily, but not intended that Steven was giving up his superior right to custody permanently. In fact, from the testimony at the hearing on this petition, it appears clear that Steven began spending more and more time with J.T. immediately following that 2005 hearing.

We believe that in light of the circumstances of this case, as set out above, and especially the fact that Steven was unrepresented and the court's failure to advise him of his rights or to question him con-

cerning his understanding of what he was giving up, Steven's silence did not constitute a waiver of his superior right to custody of his child, or his agreement to an award of permanent custody to LaTonya.

We next address the Family Court's finding that LaTonya was a de facto custodian and therefore on the same footing with Steven as to the custody of J.T. KRS 403.270 provides,

> (1)(a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.
>
> (b) A person shall not be a de facto custodian until a court determines by clear and convincing evidence that the person meets the definition of de facto custodian established in paragraph (a) of this subsection. Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section and KRS 403.280, 403.340, 403.350, 403.822, and 405.020.

The provisions of this statute are not triggered unless the biological parent has abdicated the role of primary caregiver and primary financial supporter to the per-

son who claims to be the de facto custodian for the required period of time. There must be a finding that the "de facto custodian" has been the primary caregiver and financial supporter of the child.

■ However, no evidence was taken at the hearing on Steven's petition for custody to establish whether LaTonya was the primary caregiver for, and primary financial supporter of, J.T., for the required period of time. The only fact established to support a finding that LaTonya was a de facto custodian was that J.T. had primarily resided with her since the temporary custody placement, but was presently spending 49% of the time with Steven. Therefore, while LaTonya may have become a de facto custodian, the trial court lacked a sufficient evidentiary basis for such a finding. On remand, the court should hear evidence and make the necessary findings on which to base such a determination. If LaTonya is then found to be a de facto custodian, the Family Court will be required by KRS 403.270 to determine custody between Steven and LaTonya based on the best interests of J.T., giving equal consideration to both parties, and using the factors set out in KRS 403.270(2). If LaTonya is not found to be a de facto custodian, custody should be awarded to Steven.

Based on the foregoing, we vacate the February 27, 2007, order of the Jefferson Family Court and remand this matter to that court for further proceedings consistent with this opinion.

ALL CONCUR.