RENDERED: JULY 18, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0299-MR

WESLEY SMALLWOOD AND
ELIZABETH SMALLWOOD                                                      APPELLANTS


                              APPEAL FROM BELL CIRCUIT COURT
v.                            HONORABLE KEITH A. NAGLE, JUDGE
                              ACTION NO. 23-CI-00255


JADE ALEXANDRA SMALLWOOD;
CHARLES BRIM; L.M.H.;
MATTHEW HURST; O.K.M.;
SEBASTIAN MIZE; AND S.K.S.[1]                                            APPELLEES

---

[1] The children at issue in this custody proceeding were named as parties and identified by their full names in the notice of appeal as well as in the petition for custody which initiated this case in the trial court. *See* Kentucky Rules of Appellate Procedure (RAP) 2(B)(2)(c) (providing notice of appeal shall "specify all parties to the proceedings from which the appeal is taken . . .."). However, to protect the privacy of these minor children, we do not refer to the children by name in this Opinion and we have replaced their full legal names with initials in the caption. *See* RAP 5(B)(2) ("Initials or a descriptive term must be used instead of a name in cases involving juveniles . . . ."). *See also* RAP 5(B)(1) ("The style of the action may include the names and designations of all the parties or may state the name and designation of the first party on each side with an appropriate indication of other parties.").

The children's respective fathers were also named as parties to the custody petition and in the notice of appeal. However, none of the fathers filed appellate briefs despite the appellant and appellee briefs' certifications that both fathers were served.

\*\* \*\* \*\* \*\* \*\*

BEFORE: CALDWELL, CETRULO, AND A. JONES, JUDGES.

CALDWELL, JUDGE: Wesley and Elizabeth Smallwood appeal from the Bell Circuit Court's denial of their petition for custody of the children of their daughter, Jade Smallwood. We **AFFIRM**.

## FACTS

Jade Smallwood ("Mother") has three children, born in 2014, 2017, and 2022. Wesley and Elizabeth Smallwood (individually "Grandfather" and "Grandmother" and collectively "Grandparents") are Mother's parents and the children's maternal grandparents.

Mother and the children lived in Grandparents' home in Bell County, Kentucky, from the children's births until Mother and the children went to Texas in June 2023. Prior to the summer of 2023, Mother and Grandparents all took care of the children. Mother's younger sibling (a young adult in 2023) also provided some childcare often alongside Mother, such as when Grandparents were working.

Mother occasionally left the children with Grandparents before the summer of 2023. According to Mother, she never left the children for more than a few days at a time. According to Grandparents, Mother sometimes left for months at a time prior to the summer of 2023.

Grandparents indisputably provided Mother and the children with a place to live and with many other necessities. However, Mother also bought the children necessary items such as clothes, diapers, and food – sometimes using government benefits to do so. As of 2023, Mother had been working at least intermittently at a fast-food restaurant for a few years.

According to Mother's testimony, she and the children moved to Texas in June 2023 to live with her fiancé (the youngest child's father), who was then stationed in Texas for active military duty but who was deployed overseas a couple of months later. According to Grandmother's testimony, the oldest child called Grandmother from Texas in September 2023 and said Mother was passed out on the floor from suspected drug use, so Grandparents drove to Texas.

Around the same time, Grandmother reported to Texas authorities that Mother had a pending arrest warrant on a drug possession charge in Kentucky. Mother was arrested and incarcerated in Texas. While Mother was incarcerated, Grandparents took the children with them back to their home in Bell County, Kentucky. In September 2023, Grandparents filed a petition for custody of the children in Bell Circuit Court. They also filed an *ex parte* motion for emergency custody, which was granted following an *ex parte* hearing.[2]

---

[2] According to Grandparents' testimony at the *ex parte* hearing, they spoke with police in Texas who asked them to take in the children and indicated the children would otherwise be placed in foster care.

In November 2023, Mother filed a motion, by counsel, to dismiss the custody petition. Mother asserted that to have standing to file a custody action, Grandparents would have to allege and prove by clear and convincing evidence that they qualified as *de facto* custodians or that the children's parents were unfit. She pointed out Grandparents did not allege in the petition for custody that they were *de facto* custodians, that Mother was an unfit parent, or that Mother had waived her superior right to parent the children.

Mother also submitted a supporting memorandum of law. She cited statutes and case law about how one qualifies as a *de facto* custodian. And she asserted that Grandparents had, at most, "assisted in raising the children alongside the mother, and therefore cannot qualify as de facto custodians."

Grandparents filed a request to continue the hearing on the motion to dismiss, which the circuit court granted. In December 2023, the court heard arguments on the motion to dismiss and conducted an evidentiary hearing[3] – in part to determine whether Grandparents qualified as *de facto* custodians. The circuit court orally denied the motion to dismiss. But it declined to rule on whether

---

[3] Though not discussed by the parties, the record does not reflect that Grandparents filed a written response in opposition to the motion to dismiss – but simply a request for a continuance of the hearing date. Nor does the written record reflect that Grandparents attempted to amend their petition for custody. In any event, the circuit court did not summarily grant the motion to dismiss. And Mother did not object to the court's conducting an evidentiary hearing.

-4-

Grandparents qualified as *de facto* custodians or would be granted custody at the end of the hearing. It permitted the parties to submit briefs.

In late January 2024, the circuit court issued an order with supporting findings of fact and conclusions of law. It determined that Grandparents had failed to prove by clear and convincing evidence that they were the children's *de facto* custodians. The circuit court also held that Grandparents failed to prove that Mother was unfit. It further stated Grandparents had not alleged, nor proven, that Mother waived her superior right to custody. Thus, it denied the petition for custody and ordered Grandparents to return the children to Mother.

Grandparents filed a motion to reconsider, which was denied in early February 2024. Grandparents filed a timely notice of appeal later that month. Further facts will be provided as necessary in our analysis.

## ANALYSIS

Grandparents contend the circuit court erred in denying their petition for custody. Specifically, they find fault with the circuit court's determinations that Grandparents did not prove by clear and convincing evidence that they were *de facto* custodians, that Mother was unfit, or that Mother waived her superior right to custody. We address these arguments in turn considering the applicable standard of review.

## Standard of Review

We review the circuit court's findings of fact for clear error, meaning we will not disturb such factual findings unless they are not supported by substantial evidence. *Ball v. Tatum*, 373 S.W.3d 458, 463-64 (Ky. App. 2012). But we review the circuit court's application of the law *de novo*. *Id*. at 464.

## No Reversible Error in Circuit Court's Determination that Grandparents Were Not *De Facto* Custodians

**"**[P]arents have a basic human right to direct the upbringing of their children, which is so fundamental that it warrants constitutional protection." *Jones v. Jones*, 510 S.W.3d 845, 849 (Ky. App. 2017) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). So, non-parents must show they meet the statutory requirements for *de facto* custodian status to become parties to a child custody action. *Jones*, 510 S.W.3d at 849.

KRS[4] 405.020(1) indicates that, under most circumstances, minor children must remain in the custody of their parents. However, KRS 405.020(3) states:

> A person claiming to be a de facto custodian, as defined in KRS 403.270, may petition a court for legal custody of a child. The court shall grant legal custody to the person if the court determines that the person meets the definition of de facto custodian and that the best interests of the child will be served by awarding custody to the de facto custodian.

[4] Kentucky Revised Statutes.

KRS 403.270(1) provides:

(a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who within the last two (2) years has resided with the person for an aggregate period of six (6) months or more if the child is under three (3) years of age and for an aggregate period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

(b) A person shall not be a de facto custodian until a court determines by clear and convincing evidence that the person meets the definition of de facto custodian established in paragraph (a) of this subsection. Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section and KRS 403.280, 403.340, 403.350, 403.822, and 405.020.

Grandparents' arguments for being recognized as *de facto* custodians focus primarily on how the circuit court applied the law. Grandparents generally assert the circuit court's factual findings relating to the *de facto* custodian issue are erroneous, but they do not argue any specific findings are erroneous.

Certainly, there were factual disputes about relevant matters such as the length of time Mother would occasionally leave the children with Grandparents

prior to the move to Texas. There was also a dispute about the degree to which Mother provided financial support for the children.

Moreover, Grandparents contend Mother's use of government benefits to provide for the children should be considered "support from the taxpayers and the government and not from [Mother,]" citing *Swiss v. Cabinet for Families and Children*, 43 S.W.3d 796, 798 (Ky. App. 2001). *Swiss* provides in pertinent part:

> We hold that foster parents such as the Swisses may not use the de facto custodian statutes to challenge the cabinet's custody of the child where the child was placed with the foster parents by the cabinet. . . . We also agree with the trial court that the Swisses did not meet the statutory requirements under KRS 403.270 to qualify as de facto custodians. In order to achieve de facto custodian status, the Swisses would have to have "shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of" the child. KRS 403.270(1)(a). The trial court determined that the cabinet provided the primary financial support for the child.

*Id*. at 797-98.

However, we later made clear in published precedent that *Swiss* does not prevent usage of government benefits to support a child from ever counting as providing financial support for a child for purposes of *de facto* custodian determinations. *See S.S. v. Commonwealth*, 372 S.W.3d 445 (Ky. App. 2012). In *S.S.*, we noted *Swiss* concerned foster parents' claiming to be *de facto* custodians

and we regarded any statements in *Swiss* indicating government benefits could not be considered a form of financial support to be non-binding *dicta*. *Id*. at 448.

As we stated in *S.S.*, we are not aware of any statute or controlling precedent holding that a party must use his or her own employment income – rather than government benefits or a spouse's earnings – to support a child to be considered the child's primary financial supporter. 372 S.W.3d at 448. And though this statement in *S.S.* concerned a non-parent who claimed *de facto* custodian status, the principle applies equally to parents contesting other parties' claims of *de facto* custodian status. *See Chadwick v. Flora*, 488 S.W.3d 640, 645 (Ky. App. 2016) (upholding determination that grandmother did not qualify as a *de facto* custodian after noting evidence of the mother's and grandmother's caring for the child together and the mother's seeking and receiving government benefits on the child's behalf). Moreover, Mother's testimony indicates she used not only government benefits but also her employment earnings and child support payments from the children's fathers to provide for the children.

In any event, regardless of where Mother obtained funds to support the children, the circuit court found Mother provided a more than minimal amount of financial support for the children though it also acknowledged that Grandparents provided a great deal of financial support. This finding is supported by substantial evidence. Moreover, even if Grandparents were the children's primary financial

supporters, *de facto* custodians must also be the primary caregivers. *See, e.g.*, *Swiss*, 43 S.W.3d at 798 (holding one must be the primary caregiver **and** the primary financial supporter to qualify as a *de facto* custodian).

The circuit court did not perceive Grandparents to be the children's primary caregivers. While acknowledging Grandparents had frequently provided care for the children, perhaps even spending more time doing so than Mother, the circuit court found that Mother also provided significant care.

Based on these factual findings, Grandparents contend the circuit court misunderstood the law to require that they must show they were the only caregivers or financial supporters of the children to establish *de facto* custodian status. They quote *Ball* to show they do not have to be the **only** caregivers or financial supporters of the children to be their primary caregivers and financial supporters:

> Were we to accept Ball's reading of KRS 403.270, we would be writing our own statute rather than reading the words specifically enacted by the legislature and that we cannot do. We must conclude the General Assembly chose the word "primary" to modify the terms "caregiver" and "financial supporter" for good reason. It certainly could have chosen the phrases, "only caregiver," "sole caregiver" or "exclusive caregiver," but it did not.
>
> The dictionary defines the word "primary" as "first in order of time or development (and) of first rank, importance, or value. . . ." *See Merriam-Webster Dictionary Online*, http://www.merriam-

webster.com/dictionary (last viewed May 11, 2012). Synonyms for the word "primary" include chief, dominant, first, greatest, highest, main, paramount, predominant and principal – all words that invite a comparison between multiple entities rather than describing a single entity.

373 S.W.3d at 463.

Perhaps Grandparents construe some of the language used by the circuit court in its factual findings as suggesting that Grandparents would have to show they were the only ones providing any caregiving or financial support to be deemed *de facto* custodians. For example, on page 7 of the order on appeal ("order"), the circuit court stated that Grandparents did not show they were "the primary – meaning 'singular'– source of financial support for the children." (Emphasis in original.) Similarly, the circuit court stated Grandparents "may have provided more care than [Mother], but it was not to the exclusion of [Mother]." (Page 8 of order.) However, we do not construe these findings as indicating one must be the sole caregiver or financial supporter to be a *de facto* custodian but as simply recognizing that *de facto* custodians cannot simply be among many "primary" caregivers[5] or financial supporters. As this Court stated in *Ball*, *de*

---

[5] *See also* Paragraph 9 of the circuit court's conclusions of law on page 9 of its order: "law requires a de facto custodian prove that he/she was the primary caregiver, not a primary caregiver." (Emphasis in original) (internal quotation marks omitted).

-11-

*facto* custodians of a child are chief, principal, or dominant caregivers in comparison to the child's parents or other caregivers.  373 S.W.3d at 463.[6]

Certainly, Grandparents are correct that they were not required to show they were the **only** caregivers or financial supporters of the children to be *de facto* custodians.  However, Kentucky precedent also clearly states that co-parenting children alongside a parent who provides significant care and financial support to the children does not transform a non-parent into a *de facto* custodian. *See, e.g.*, *Mullins v. Picklesimer*, 317 S.W.3d 569, 574 (Ky. 2010); *Burgess v. Chase*, 629 S.W.3d 826, 832 (Ky. App. 2021); *Chadwick*, 488 S.W.3d at 644-45. Instead, non-parents become *de facto* custodians only when they are literally allowed to stand in the place of parents who have abdicated their own roles as

---

[6] Noting the lower court's factual finding that both maternal grandparents were the primary caregivers of the child in affirming its *de facto* custodian determination, this Court also recognized a married couple could properly be considered a child's *de facto* custodians upon proper proof despite suggestions in prior precedent that the requirement that a *de facto* custodian be **the** primary caregiver of the child meant only one person could be a child's *de facto* custodian. *Ball*, 373 S.W.3d at 464, *distinguishing Consalvi v. Cawood*, 63 S.W.3d 195 (Ky. App. 2001), in which this Court stated:

> In this case, it is clear that the statute is intended to protect someone who is the primary provider for a minor child in the stead of a natural parent; if the parent is not the primary caregiver, then someone else must be.  The de facto custodian statute does not, contrary to Cawood's position at oral argument, intend that multiple persons be primary caregivers.

*Id.* at 198.  *Consalvi* has been overruled on other grounds.  *See, e.g.*, *Boone v. Ballinger*, 228 S.W.3d 1, 9 (Ky. App. 2007) (citing *Moore v. Asente*, 110 S.W.3d 336, 336 (Ky. 2003)).

primary caregivers and financial supporters. *Burgess*, 629 S.W.3d at 833. *See also London v. Collins*, 242 S.W.3d 351, 358-59 (Ky. App. 2007).

The circuit court specifically found Mother did not abdicate her caregiving role, citing *London*, 242 S.W.3d at 351. It also recognized the difficulty of demonstrating who was the primary caregiver since the parties shared a home with the children for a long time. However, the court indicated it was not convinced that Mother had intentionally left the children for long periods. The court noted Grandmother could not identify the dates of Mother's absences from the home except for an approximately month-long period in the summer of 2020 coinciding with Mother's criminal charge. Moreover, the circuit court determined, Mother had taken enough of an active role in caring for the children that it could not find Grandparents to be the children's primary caregivers rather than Mother.

The circuit court noted undisputed evidence that Grandmother "was the primary provider of the bed-time routine for the children" and took care of the children when they were sick at night, as Mother admitted her third-shift job interfered with such duties in the evening. But it also took note that Grandmother admitted to leaving the children in Mother's care (along with an adult sibling) when Grandmother was at work and that Mother: "testified that she often provided care and nurture for her children, both during the morning hours and at other times."

Even though the circuit court stated that perhaps Grandparents may have spent more time providing day-to-day care for the children than Mother, it determined that Mother had not abdicated her caregiving role to Grandparents and that Grandparents did not show they were the primary caregivers by clear and convincing evidence. This determination does not reflect a misapplication of the law. Instead, it is consistent with precedent in which grandparents were held not to be *de facto* custodians, despite their testifying to providing most of the caregiving for significant periods, because the parents at issue did not abdicate their parental roles but instead co-parented with the grandparents. *See Chadwick*, 488 S.W.3d at 642-45 and *Burgess*, 629 S.W.3d at 828, 832-33.

And while another factfinder might have assessed the evidence differently, we cannot say that the circuit court's findings that Mother provided significant support and care were clearly erroneous. As we stated in *Ball*:

> As the fact-finder, the court had sole discretion to determine the quality, character, and substance of the evidence, and the sole duty to judge the credibility of the witnesses. . . . It was its responsibility alone to believe or disbelieve the testimony. . . . . Furthermore, when the testimony before the trial court is conflicting, we will not substitute our decision for the trial court's judgment.

373 S.W.3d at 465 (citations omitted).

Moreover, despite Grandparents' citation to two published opinions which they argue show the circuit court erred in not regarding them as *de facto* custodians, these cited cases are distinguishable and do not compel reversal here.

Grandparents contend this case is factually like *Ball*, 373 S.W.3d at 464, and another case in which the trial courts' determinations that non-parent relatives were *de facto* custodians were upheld on appeal. *See id.*; *Hicks v. Halsey*, 402 S.W.3d 79, 83 (Ky. App. 2013).

In *Hicks*, this Court noted there was no dispute that the natural parent left the child in the care of a non-parent relative and did not even attempt to try to see the child for six months before the relative filed a petition to be considered a *de facto* custodian and for custody. *Id.* at 80-81. In contrast, whether Mother was absent for long periods was a matter of significant dispute here. Although Grandparents testified to Mother's being absent for long periods, Mother testified to always being with her children except for only brief absences prior to the move to Texas.

Moreover, we concluded in *Hicks* that the trial court's finding that the non-parent relative was the child's primary caregiver was supported by substantial evidence. And we perceived no reason to disturb the trial court's findings that the non-parent relative had acted in place of a parent rather than alongside a parent and that the parent at issue had been neither involved nor present. *Id.* at 82. Similarly,

we perceive no reason to disturb the circuit court's reaching the opposite result here since the circuit court's findings were supported by substantial evidence. Notably, the circuit court determined Grandparents engaged in co-parenting rather than acting in place of a parent despite recognizing conflicts in the parties' testimony about caregiving.

Much as the circuit court did here, this Court recognized the parties presented conflicting accounts in *Ball* – despite also characterizing the evidence as showing that the mother played a "minimal" role in her child's care and allowed her parents to act as the child's parents in her stead. 373 S.W.3d at 464-65.[7] Upholding the trial court's *de facto* custodian determination, we noted we must defer to the trial court's assessment of witness credibility and weighing of the evidence. *Id*. at 465. Likewise, we must defer to the circuit court's assessment of witness credibility and weighing of the evidence here – though it reached the opposite result than *Ball*.

Regardless of conflicting evidence, there was substantial evidence to support the circuit court's factual findings here. Moreover, the circuit court

---

[7] In affirming the lower court's *de facto* custodian determination in *Ball*, this Court stated it appeared the mother's "parenting role was minimal at best" and "the Tatums had assumed the role of parents and stood in Ball's place . . . ." 373 S.W.3d at 464. Presumably, we meant there was evidence to support lower court findings that the mother provided minimal caregiving and that the grandparents acted as the child's parents in her stead. In contrast, despite Grandparents' arguments to the contrary, the circuit court here explicitly found that Mother provided more than minimal care and financial support and that Grandparents did not act as the children's parents in Mother's stead but rather engaged in co-parenting alongside Mother.

-16-

properly applied binding precedent in determining the parties' relationship to be a co-parenting one which did not confer *de facto* custodian status on Grandparents – rather than one in which Mother had abdicated her parental role and allowed Grandparents to act in her place as the children's parents. Thus, we discern no reversible error in the circuit court's determination that Grandparents did not qualify as *de facto* custodians.

Next, we address Grandparents' contention that the family court erred in not finding Mother unfit.

**No Reversible Error in Circuit Court's Not Finding Mother Unfit**

The circuit court determined Grandparents failed to prove by clear and convincing evidence that Mother was an unfit parent. It stated in its conclusions of law: "the proof required for unfitness requires that the Petitioners [Grandparents] produce evidence that would likewise support the involuntary termination of parental rights." The circuit court also stated in its factual findings:

> Although the Petitioners did not specifically raise Respondent's [Mother's] [alleged] unfitness in the pleadings, unfitness was suggested in the Petitioner's proof, and the Court finds that while the Respondent's life choices and criminal record raise an eyebrow, the record herein falls short of establishing Respondent as unfit to raise her children.

Like the circuit court, Mother points out that Grandparents did not even allege she was unfit in pleadings, though they alleged she was unfit at the December 2023 hearing.

Mother notes Grandmother testified that Mother had a tumultuous life. But Mother asserts there was no evidence that would support a finding that she was unfit. She points out the circuit court was correct in stating that evidence of unfitness is essentially evidence that would support the involuntary termination of parental rights. *See Allen v. Devine*, 178 S.W.3d 517, 526 (Ky. App. 2005) (quoting *Asente*, 110 S.W.3d at 360) ("To prove the parent is unfit, the non-parent must demonstrate by clear and convincing evidence that the parent 'engaged in conduct similar to activity that could result in the termination of parental rights by the state.'").

Mother argues there was no evidence of abuse, abandonment, or failure to provide essential care for reasons other than poverty alone. *See Devine*, 178 S.W.3d at 526 (citing *Davis v. Collinsworth*, 771 S.W.2d 329, 330 (Ky. 1989)):

> The type of evidence necessary to demonstrate a parent to be unfit includes: (1) evidence of inflicting or allowing to be inflicted physical injury, emotional harm or sexual abuse; (2) moral delinquency; (3) abandonment; (4) emotional or mental illness; and, (5) failure, for reasons other than poverty alone, to provide essential care for the children.

-18-

She asserts the circuit court was correct in not finding her to be unfit.

Grandparents, however, contend the circuit court erred in rejecting their argument that they proved by clear and convincing evidence that Mother was unfit. They point to evidence of Mother's possessing drugs, her uprooting the children from the community where they had lived for their entire lives to move to Texas, her living with a man who was still married to someone else (though undergoing divorce proceedings according to Mother), and the oldest child's having to care for the other children when Mother was unconscious.

Grandparents also contend Mother abandoned the children when she was arrested and incarcerated in Texas. And they allege Mother tried to place the children in the custody of a non-relative, citing to power of attorney documents, which Mother purportedly executed for one child's paternal grandfather regarding all three children. Grandparents contend there is therefore evidence of abandonment, moral delinquency, and failure to provide essential care for reasons other than poverty alone. However, we discern no reversible error in the circuit court's not finding proof of unfitness by clear and convincing evidence based on the record before us.

We recognize that unlike its more detailed findings relating to *de facto* custodian status, the circuit court's findings and legal analysis on alleged unfitness are somewhat sparse. Nonetheless, the circuit court did not misstate the law in

noting that evidence of unfitness is akin to evidence which would support an involuntary termination of parental rights. *See, e.g.*, *Devine*, 178 S.W.3d at 526. Moreover, given the deference we must afford to the circuit court's determinations of witness credibility and weighing of the evidence, we cannot say the circuit court's factual findings on matters related to unfitness are clearly erroneous, meaning not supported by substantial evidence. *See Asente*, 110 S.W.3d at 354.

For example, regarding Grandmother's testimony about the oldest child calling her in the middle of the night to say Mother was passed out from drugs, the circuit court stated on page 5 of its order that it would give this hearsay testimony "its due weight" – suggesting it found such testimony less than persuasive. *See, e.g.*, KRE[8] 802. Moreover, the circuit court indicated it did not believe Mother purposely left the children for long periods and it referred to undisputed evidence that Grandmother arranged for Mother to be arrested in Texas after threatening to do so if Mother moved there with the children. The circuit court also noted that other than an approximately four-week period in July 2020 (coinciding with Mother's criminal charge), Grandmother could not provide specific dates for Mother's absences from the home from 2021 until 2023.

We also note that, for purposes of parental unfitness and/or involuntary termination of parental rights, a finding of abandonment requires more

---

[8] Kentucky Rules of Evidence.

-20-

than just a finding that a parent was incarcerated or otherwise physically absent. Instead, a finding of abandonment must be supported by evidence of a "settled purpose to forego all parental duties and relinquish all parental claims" to one's children. *J.H. v. Cabinet for Human Resources*, 704 S.W.2d 661, 663 (Ky. App. 1985) (quoting *O.S. v. C.F.*, 655 S.W.2d 32, 34 (Ky. App. 1983)). Given this standard and the conflicting evidence in the record, we discern no reversible error in the circuit court's not finding Mother to be unfit based on abandonment.

Nor do we discern any reversible error in the circuit court's assessment that Mother was not unfit on other grounds such as moral delinquency,[9] despite the circuit court's noting Mother's criminal charge and perhaps some questionable lifestyle choices. Despite Grandparents' disapproval of Mother's moving with the children to Texas and of her romantic involvement with someone

---

[9] This Court lacks the authority to overrule precedent from our Supreme Court. Rules of Supreme Court (SCR) 1.030(8)(a). Thus, we cannot overrule precedent such as *Collinsworth*, 771 S.W.2d 329, which lists moral delinquency as a ground for determining a parent to be unfit. *Id.* at 330. However, there appears to be no recent published precedent substantively discussing the concept of moral delinquency or how this may be proven by clear and convincing evidence.

Apparently, moral delinquency was listed as ground for unfitness in *Collinsworth* based on older precedent vaguely alluding to evidence of "indiscretions" and the like to indicate that a parent may be considered unfit on moral grounds. *See generally Hall v. Fehler*, 261 S.W.2d 646, 647 (Ky. 1953).

We suggest it would be more appropriate to remove the vague and subjective term of *moral delinquency* from the list of possible grounds of unfitness for these purposes and instead list only factors corresponding to the grounds of parental unfitness identified in KRS 625.090(2), which relate to parental conduct affecting children. Though we cannot overrule prior precedent from our Supreme Court or its predecessor court, SCR 1.030(8)(a), we hope our Supreme Court will address this matter accordingly in a case properly before it.

-21-

still married to someone else, this does not mean the circuit court was compelled to conclude Grandparents proved Mother unfit due to moral delinquency by clear and convincing evidence.

We also discern no reversible error in the circuit court's not finding mother unfit based on failure to provide essential care and protection for reasons other than poverty. The circuit court noted evidence showing Mother provided significant care and necessities for the children and indicated it did not find Grandparents' testimony about Mother's absences any more persuasive than Mother's testimony on this matter. In sum, given the substantial evidence supporting the circuit court's factual findings and the deference we must afford to the circuit court's assessment of witness credibility and weighing of the evidence, we discern no reversible error in its determination that Grandparents failed to prove by clear and convincing evidence that Mother was unfit. *See generally Asente*, 110 S.W.3d at 354, 360.

### No Palpable Error in Circuit Court's Not Finding that Mother Waived Her Superior Right to Custody

Lastly, Grandparents contend the circuit court should have found that Mother waived her superior right to custody by executing power of attorney documents for one child's paternal grandfather regarding all three children. Mother contends this issue was not properly preserved for our review in her

-22-

appellee brief, and Grandparents did not file a reply brief to respond to this contention.

Grandparents' appellant brief refers to power of attorney documents in the written record.[10] Grandparents do not cite to any portion in the record, however, where they argued to the circuit court that Mother's execution of these documents amounted to a waiver of her superior right to custody. Nor do they cite to the record to show that they raised the issue of whether Mother waived her superior right to custody at all. Moreover, the circuit court did not discuss any power of attorney document in its order denying Grandparents custody. The court simply stated Grandparents neither alleged nor proved that Mother waived her superior right to custody. In short, Grandparents failed to show where they brought any allegation of waiver to the circuit court's attention or demanded a ruling on this issue – much less any specific assertion that Mother waived her superior right of custody by executing a power of attorney.[11]

This failure to show where the issue is preserved affects the standard of review we employ on appeal – *i.e.*, "whether we employ the recognized standard

---

[10] There appear to be two power of attorney documents (each one page long) at pages 115-16 of the record. One is labeled a temporary power of attorney.

[11] *See Gasaway v. Commonwealth*, 671 S.W.3d 298, 313-14 (Ky. 2023) (stating one does not have to make identical supporting arguments to a trial court to preserve an allegation of error or issue for appellate review, although a party may forfeit an issue by failing to raise the issue to the trial court at all).

of review, or in the case of an unpreserved error, whether palpable error review is being requested and may be granted." *Turner v. Turner*, 672 S.W.3d 43, 51 (Ky. App. 2023) (quoting *Oakley v. Oakley*, 391 S.W.3d 377, 380 (Ky. App. 2012)).

We are also not obligated to scour the record to see if this issue was raised to the trial court. *Koester v. Koester*, 569 S.W.3d 412, 415 (Ky. App. 2019). And we have not come across any indication Grandparents raised the issue of waiver – especially based on a power of attorney – to the circuit court. In sum, we consider this issue to be unpreserved.

Moreover, especially since Grandparents did not request that this Court review this unpreserved issue about waiver for palpable error, this Court could decline to discuss the issue of waiver at all. *See Gasaway*, 671 S.W.3d at 315 (declining to reach issue about application of Kentucky constitutional provision because the issue was not raised to the trial court). Although *Gasaway* is a criminal law case to which the Kentucky Rules of Criminal Procedure (RCr) apply unlike this civil case, Kentucky's civil and criminal procedural rules about unpreserved error contain identical language. *See Nami Resources Company, L.L.C. v. Asher Land and Mineral, Ltd.*, 554 S.W.3d 323, 338 (Ky. 2018) ("The language of CR[12] 61.02 is identical to its criminal law counterpart, RCr 10.26, and we interpret that language identically.").

---

[12] Kentucky Rules of Civil Procedure.

-24-

CR 61.02, like RCr 10.26, indicates courts **may** but **do not have to** review unpreserved issues for palpable error resulting in manifest injustice:

> A palpable error which affects the substantial rights of a party **may** be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief **may** be granted upon a determination that manifest injustice has resulted from the error.

(Emphasis added.)

Even if we leniently review this unpreserved issue about alleged waiver for palpable error, however, we do not perceive that the circuit court's declining to find that Mother waived her superior right to custody resulted in manifest injustice. CR 61.02. "Whether a parent has waived his or her superior right to custody under KRS 405.020 is a fact-specific determination that should be made after consideration of all relevant factors." *Asente*, 110 S.W.3d at 361. Waiver may be proven by clear and convincing evidence based on a parent's "decisive, unequivocal conduct reasonably inferring the intent to waive, as long as statements and supporting circumstances [are] equivalent to an express waiver." *Id*. at 360 (internal quotation marks and footnotes omitted). For instance, a parent's filing a petition to voluntarily terminate his/her parental rights or a knowing, voluntary consent to adoption could amount to an express waiver of one's superior right to custody. *Id.* at 361.

While Mother certainly did not expressly waive her superior custody rights through filing a petition for voluntary termination of parental rights or a consent for adoption, Grandparents nonetheless contend power of attorney documents in the record show Mother waived her superior right to custody of the children. They assert Mother executed these documents to surrender custody of the children to one child's paternal grandfather, giving him physical custody and related rights. In their brief they contend this amounted to her trying to "steer custody to someone with no right to it[.]"

Grandparents also argue Mother's execution of the power of attorney document by itself shows she waived her superior right to custody, citing *J.S.B. v. S.R.V.*, 630 S.W.3d 693, 705 (Ky. 2012), and *Penticuff v. Miller*, 503 S.W.3d 198, 203 (Ky. App. 2016). However, based on our review, these cited cases simply list execution of a medical power of attorney as one possible factor to consider in determining whether a parent has waived his or her superior right to custody.

Both of these cited cases do so while discussing *Picklesimer*, 317 S.W.3d 569, in which our Supreme Court found helpful a list of several factors for consideration of parental waiver issues from out-of-state precedent. *Id.* at 580 (quoting *Heatzig v. MacLean*, 191 N.C. App. 451, 460, 664 S.E.2d 347, 353-54 (2008)). Notably, there is no clear indication that any power of attorney had been executed or was at issue in *Picklesimer*, 317 S.W.3d 569, or the two cases cited by

Grandparents. Certainly, all three Kentucky cases state a power of attorney is a factor to consider in determining whether a parent waived his/her superior right to custody. However, none of these cases directly hold that a parent waived his/her superior right to custody solely by executing a power of attorney.

Moreover, Grandparents' merely pointing to power of attorney documents in the written record without citing to further evidence about relevant circumstances does not demonstrate manifest injustice resulting from the circuit court's not finding a waiver of Mother's superior right to custody.

We note the power of attorney documents appear to have been executed in Texas in September 2023, around the same time Mother was arrested and incarcerated and thus presumably needed to arrange for her children's care. Also, Grandparents have not cited to any testimony about the authenticity of these documents or the circumstances of their alleged execution.[13] Nor have they cited any authority about the legal effect, if any, of this document in Texas or elsewhere, and it is not our job to make arguments or cite authority on their behalf. *See Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005) (failure to cite supporting authority waives alleged error and appellate courts are not required to "to research and construct a party's legal arguments").

---

[13] Mother asserts in her brief that no one testified about a power of attorney before the circuit court. Grandparents did not file a reply brief to challenge this assertion. And we did not locate any testimony about a power of attorney when viewing the recorded hearing.

Therefore, we discern no palpable error in the circuit court's failing to make a *sua sponte* finding that Mother waived her superior right to custody based on the mere presence of power of attorney documents in the written record.

In sum, we discern no reversible error in the family court's denial of Grandparents' petition for custody of Mother's children. Further arguments raised in the briefs but not discussed herein have been determined to lack merit or relevancy to our resolving this appeal.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM**.


ALL CONCUR.


BRIEF FOR APPELLANTS:

C. Bishop Johnson
Pineville, Kentucky

BRIEF FOR APPELLEE JADE
SMALLWOOD:

Mary-Ann Smith
Corbin, Kentucky

NO BRIEFS FILED FOR OTHER
APPELLEES.