RENDERED:  JUNE 5, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1406-MR

PAUL MITCHELL YORK AND
RENADA SUE YORK                                                     APPELLANTS


APPEAL FROM MARSHALL CIRCUIT COURT
v.        HONORABLE JAMES G. ADAMS, JR., SPECIAL JUDGE
ACTION NO. 21-CI-00358


SHAWN D. HAMLET AND
KATHRYN G. MECKE                                                      APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, A. JONES, AND KAREM, JUDGES.

JONES, A., JUDGE:  Paul Mitchell York ("Grandfather") and Renada York

("Step-Grandmother") (collectively "Grandparents") appeal from the Marshall

Family Court's August 12, 2024 Findings of Fact, Conclusions of Law, and

Judgment dismissing their petition seeking *de facto* custodian status and custody

of their grandchild, M.T.M.[1] ("Child").  Grandparents principally argue that the successor special judge lacked authority to revisit an earlier interlocutory ruling entered by a prior special judge determining that they qualified as Child's *de facto* custodians.  Alternatively, they contend the family court's final judgment is not supported by substantial evidence.  Following careful review, we affirm.

## I. BACKGROUND[2]

Child was born in 2015 to Shawn Hamlet ("Father") and Kathryn Mecke ("Mother").  Grandfather and Step-Grandmother are Child's maternal grandparents.  Father is currently married to Katie Hamlet ("Stepmother").  Collectively, we refer to Father and Stepmother as "Parents."

On or about May 31, 2016, Father obtained permanent sole legal custody of Child pursuant to an order entered in a separate action, Marshall Family Court Case No. 15-CI-00338, styled *Shawn Hamlet v. Kathryn Mecke and the Cabinet for Health and Family Services*.[3]  Although Father retained sole legal

---

[1] Occasionally, in the record below, Child is referred to as M.T.H.  We refer to Child as M.T.M., the designation used in the parties' initial pleadings.

[2] This matter has a lengthy procedural history involving multiple evidentiary hearings conducted over an extended period of time before two separately appointed special judges.  The proceedings included testimony from numerous witnesses and the introduction of substantial documentary and photographic evidence.  While we have carefully reviewed the entire record, for brevity's sake we recount only those facts and procedural events necessary to place the issues before us in their proper factual and procedural context.

[3] Mother was granted supervised visitation with Child, which she continues to exercise.  While Mother was included in the proceedings below, she has not participated in this appeal.

-2-

custody thereafter, Child continued spending substantial time with Grandparents. Initially, Child alternated between Father's residence and Grandparents' residence with some regularity. Beginning in approximately late 2018, however, Child began residing with Grandparents with increasing frequency. During the COVID-19 pandemic, Child resided with Grandparents on what became an almost full-time basis for an extended period.

On November 8, 2021, Grandparents filed a petition in the Marshall Family Court seeking custody of Child and a determination that they qualified as Child's *de facto* custodians. Father denied the allegations and moved to dismiss the petition, asserting Grandparents failed to satisfy the statutory requirements for *de facto* custodian status.[4] On May 9, 2022, the First Presiding Judge conducted the first of multiple evidentiary hearings in the matter. At that hearing, the First Presiding Judge expressly bifurcated the proceedings, limiting the initial hearing to the issue of whether Grandparents qualified as Child's *de facto* custodians and reserving any custody and best-interest determinations for later proceedings. Thereafter, on May 20, 2022, the First Presiding Judge entered an order determining that Grandparents qualified as Child's *de facto* custodians. Father

---

[4] Grandparents' petition was originally assigned to the Honorable Stephanie Perlow. Judge Perlow recused because she had previously served as guardian *ad litem* during prior litigation involving Child. The Honorable Jill Clark ("First Presiding Judge") was thereafter appointed as special judge to preside over the action.

-3-

subsequently filed a CR[5] 59.05 Motion to Alter, Vacate, or Amend. In an order entered on July 5, 2022, the First Presiding Judge granted the motion in part and denied it in part, ultimately stating in the order's concluding paragraph: "this Court finds the Petitioners are the *de facto* custodians of the minor child. The Court finds the parties were not coparenting the child."[6] The First Presiding Judge thereafter left the case prior to entry of a final judgment.

By August 2022, the case had been reassigned to the Honorable James G. Adams, Jr., who was appointed to continue serving as special judge in the matter (hereinafter "Successor Judge"). The Successor Judge thereafter conducted additional evidentiary hearings on January 6, 2023, and April 14, 2023. Following review of the evidence presented throughout the proceedings, the Successor Judge entered Findings of Fact, Conclusions of Law, and Judgment on August 12, 2024, dismissing Grandparents' petition.

In doing so, the Successor Judge concluded that although Child had resided with Grandparents for substantial periods of time, the evidence as a whole did not establish that Grandparents satisfied the statutory requirements for *de facto* custodian status under KRS[7] 403.270. Specifically, the Successor Judge

---

[5] Kentucky Rules of Civil Procedure.

[6] While the family court declined to alter its ultimate ruling, it granted the motion to the extent it corrected several typographical errors contained in the prior order.

[7] Kentucky Revised Statutes.

determined that Father never abdicated his parental and custodial role, but instead continued participating in decisions concerning Child's upbringing alongside Grandparents while also maintaining insurance coverage for Child, offering financial assistance for Child's education and care, and continuing to foster his parental relationship with Child through visitation, outings, and other activities. Grandparents thereafter filed a CR 59.05 motion, which the family court denied by order entered October 31, 2024. This appeal followed. Additional facts relevant to the parties' arguments will be discussed as necessary below.

## II. ANALYSIS

Grandparents' primary argument on appeal is that the family court erred when it reconsidered the First Presiding Judge's interlocutory order concluding that Grandparents qualified as Child's *de facto* custodians. Grandparents maintain the issue had already been conclusively resolved and that nothing permitted the Successor Judge to revisit that determination. Father responds that the First Presiding Judge's order remained interlocutory throughout the proceedings and that nothing prohibited the Successor Judge from reconsidering the issue prior to entry of a final judgment.

Alternatively, Grandparents argue that even if the Successor Judge possessed authority to revisit the issue, the family court nevertheless erred because substantial evidence did not support its conclusion that Grandparents failed to

qualify as Child's primary caregivers and financial supporters for the requisite statutory period. Father, however, maintains substantial evidence supported the family court's decision where the proof demonstrated that he continued coparenting Child alongside Grandparents by maintaining medical insurance coverage for Child, participating in major decisions concerning Child's education and medical care, and continuing to foster and maintain his parental relationship with Child through visitation, outings, and other activities.

Each argument is addressed below in turn.

### A. Successor Judge's Authority to Revisit First Presiding Judge's Prior Order

Grandparents do not challenge the family court's general subject matter jurisdiction over their petition. Rather, their argument concerns how the family court exercised that authority and whether the Successor Judge was permitted to revisit the First Presiding Judge's prior interlocutory ruling regarding *de facto* custodian status. *See Commonwealth v. Eckerle*, 470 S.W.3d 712, 720 (Ky. 2015). When a dispute concerns the propriety of a court's exercise of otherwise lawful jurisdiction in a particular case, it presents an issue of particular-case jurisdiction. *Commonwealth v. Steadman*, 411 S.W.3d 717, 722 (Ky. 2013). Questions concerning jurisdiction are reviewed *de novo*. *Commonwealth v. B.H.*, 548 S.W.3d 238, 242 (Ky. 2018).

Grandparents correctly concede that traditional *res judicata* principles do not apply because no final judgment had been entered prior to dismissal of their petition. Nevertheless, they maintain that the Successor Judge either lacked authority, or at minimum abused his discretion, by revisiting the First Presiding Judge's prior ruling determining that Grandparents qualified as Child's *de facto* custodians. According to Grandparents, the First Presiding Judge's ruling had become the "law of the case" and therefore could not later be reconsidered.

As this Court explained in *Kincaid v. Johnson, True & Guarnieri, LLP*, 538 S.W.3d 901 (Ky. App. 2017):

> "The law-of-the-case doctrine is 'an iron rule, universally recognized, that an opinion or decision of an appellate court in the same cause is the law of the case for a subsequent trial or appeal however erroneous the opinion or decision may have been.'" *Univ. Med. Ctr., Inc. v. Beglin*, 432 S.W.3d 175, 178 (Ky. App. 2014) (quoting *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, 291 S.W.2d 539, 542 (Ky. 1956)). . . . The law-of-the-case doctrine is "a mechanism by which matters once litigated and finally determined remain final." *Id.*

*Id.* at 916-17.

The law-of-the-case doctrine is predicated upon principles of *finality* and generally concerns issues finally resolved during *prior appellate* proceedings arising from the same litigation. *Public Service Commission of Kentucky v. Metropolitan Housing Coalition*, 652 S.W.3d 648, 652 (Ky. App. 2022); *Armstrong v. Estate of Elmore*, 647 S.W.3d 214, 217 (Ky. 2022). The order at

issue here, however, was ***not a final appellate determin**ation*. Rather, it was an *interlocutory* family court order entered during an ongoing bifurcated custody proceeding.

A final or appealable judgment is "a final order adjudicating all the rights of all the parties in an action or proceeding, or a judgment made final under Rule 54.02." CR 54.01. Here, the First Presiding Judge's order did not provide Grandparents with the ultimate relief requested in their petition, namely custody of Child. Thus, the order did not adjudicate all rights of all parties. Rather, the order resolved only the preliminary issue of whether Grandparents qualified *as de facto* custodians, an issue the First Presiding Judge expressly determined must be addressed before the court could proceed to any custody and best-interest determination.

CR 54.02 expressly provides that absent specific finality recitations, "any order or other form of decision, however designated," adjudicating fewer than all claims or the rights and liabilities of fewer than all parties, "is interlocutory and subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Here, the First Presiding Judge expressly bifurcated the proceedings, limiting the initial hearing to the issue of *de facto* custodian status while reserving all custody and best-interest determinations for later proceedings. The May 20, 2022, order did

not finally adjudicate the action, contain CR 54.02 finality language, or otherwise terminate the litigation. Accordingly, it remained interlocutory and subject to revision. *Cherry v. Carroll*, 507 S.W.3d 23, 27 (Ky. App. 2016) ("Determination of a request for *de facto* custodian status does not strip 'a party of a right in such a manner as to remove from the court the power to return the parties to their original condition.'") (quoting *Druen v. Miller*, 357 S.W.3d 547, 549 (Ky. App. 2011).

Kentucky courts have long recognized that interlocutory rulings remain subject to reconsideration prior to final judgment. *See Bank of Danville v. Farmers Nat. Bank of Danville*, 602 S.W.2d 160, 164 (Ky. 1980) ("The . . . Order was interlocutory and subject to change by the trial court at any time prior to the final adjudication."). Likewise, "[t]he trial court is charged with weighing the evidence and evaluating credibility, *at any time it reviews the evidence.*" *JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats*, 424 S.W.3d 902, 910 (Ky. 2014) (emphasis added). Indeed, the Supreme Court specifically recognized that a trial court retains authority to "correct its prior ruling, albeit late in the case[.]" *Id.* at 911.

Here, the Successor Judge was tasked with entering the final custody determination following additional evidentiary hearings conducted after reassignment of the case. In doing so, the Successor Judge was permitted to consider the entirety of the evidence presented throughout the proceedings,

-9-

including evidence relevant to witness credibility, the nature of the parties' caregiving arrangement, and the extent of Father's continued involvement in Child's life. After considering the record as a whole, the Successor Judge ultimately reached a different conclusion regarding *de facto* custodian status. Under these circumstances, the family court acted within its authority in revisiting the issue prior to entry of final judgment. *Id.*

## B. Whether Substantial Evidence Supported the Successor Judge's Decision

Grandparents next argue that even if the Successor Judge possessed authority to revisit the interlocutory *de facto* custodian ruling, the family court nevertheless erred because substantial evidence did not support its ultimate conclusion that they failed to qualify as Child's *de facto* custodians under KRS 403.270.

"Substantial evidence" is evidence of substance and relevant consequence sufficient to induce conviction in the minds of reasonable people. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Under CR 52.01, we defer to the family court's factual findings unless clearly erroneous, giving due regard to the family court's superior opportunity to evaluate witness credibility and weigh conflicting testimony. *Id.*

A person may qualify as a "*de facto* custodian" when shown by "clear and convincing evidence to have been the primary caregiver for, and

financial supporter of, a child" for the statutorily required period of time.  KRS

403.270(1)(a).  "[A] *de facto* custodian is never a natural parent, and instead is

someone who has limited rights based on parents' failure to parent their child."

*Lemaster v. Stiltner*, 718 S.W.3d 840, 856 (Ky. 2025).  In providing *de facto*

custodians legal standing vis-à-vis parents, KRS 403.270 is intended to protect

individuals who have assumed the parental role "in the stead of a natural

parent[.]"  *Id.* (internal quotation marks and citation omitted).  Indeed, "if the

parent is not the primary caregiver, then someone else must be."[8]  *Id*.

The burden imposed upon one seeking *de facto* custodian status is

substantial.  "[P]arents have a basic human right to direct the upbringing of their

children, which is so fundamental that it warrants constitutional protection."

*Jones v. Jones*, 510 S.W.3d 845, 849 (Ky. App. 2017) (citing *Santosky v. Kramer*,

455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).  Kentucky courts have

consistently recognized the superior constitutional rights of natural parents

concerning the care, custody, and control of their children.  *Brumfield v. Stinson*,

368 S.W.3d 116, 118 (Ky. App. 2012) (citing *Moore*, 110 S.W.3d 336).

Consequently, before a nonparent may be placed on equal footing with a

biological parent in a custody dispute, the court must first determine that the

---

[8] Though the statute refers to "a person," Kentucky courts have recognized that a married couple may qualify collectively as a single *de facto* custodian unit.  *Id.* at 855.

-11-

biological parent abdicated the role of primary caregiver and financial supporter for the requisite statutory period. *Id.* (citing *London v. Collins*, 242 S.W.3d 351 (Ky. App. 2007)).

Put differently, "one must literally stand in the place of the natural parent to qualify as a *de facto* custodian." *Brumfield*, 368 S.W.3d at 118 (quoting *Consalvi v. Cawood*, 63 S.W.3d 195, 198 (Ky. App. 2001), *overruled on other grounds by Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007)). Importantly, our courts have repeatedly recognized that parenting a child alongside a biological parent does not satisfy the *de facto* custodian standard. *See Mullins v. Picklesimer*, 317 S.W.3d 569, 573-74 (Ky. 2010). "A grandparent who co-parents a child with the natural mother or father does not make the grandparent the primary caregiver." *Chadwick v. Flora*, 488 S.W.3d 640, 644 (Ky. App. 2016). Thus, "even if a nonparent provides care and/or financial support for a child, if such is in conjunction with a natural parent, the nonparent will not qualify as a *de facto* custodian." *Brumfield*, 368 S.W.3d at 118.

Here, the evidence concerning Child's caregiving arrangement was extensive and sharply disputed. Grandparents presented substantial testimony establishing that Child resided with them for extended periods of time beginning in approximately 2018 and throughout much of the COVID-19 pandemic. Grandmother testified that she handled much of Child's day-to-day care, including

-12-

homeschooling, transportation to therapy and medical appointments, extracurricular activities, and much of Child's routine supervision and structure.

Grandparents further presented testimony indicating they bore many of the financial costs associated with Child's upbringing, including educational expenses, co-pays, therapy expenses, clothing, food, and extracurricular activities. Several witnesses additionally testified regarding Child's close emotional bond with Grandparents and his behavioral struggles surrounding visitation exchanges with Parents.

However, the family court also heard substantial countervailing evidence supporting Father's position that he never relinquished or abandoned his parental role. Father retained sole legal custody of Child throughout the relevant period. The evidence demonstrated that Father maintained medical and dental insurance coverage for Child and continued participating in major decisions concerning Child's education, therapy, and medical care. Grandmother herself acknowledged that she routinely communicated with Father or Stepmother concerning Child's care and sought their approval or input regarding significant decisions. Testimony further established that Parents remained involved in Child's life through visitation, outings, holidays, birthday celebrations, and other activities. Father and Stepmother additionally testified that they offered financial

assistance for Child's schooling, clothing, and other expenses, but that such offers were often declined by Grandparents.

The family court also heard testimony explaining that Child's extended residence with Grandparents intensified during the COVID-19 pandemic because Stepmother worked in a hospital environment with repeated exposure to infected patients, resulting in periods of quarantine and isolation within Parents' household. Both Father and Stepmother testified that they viewed the arrangement as temporary and cooperative in nature rather than an abdication of Father's parental responsibilities.

Ultimately, this case did not present a circumstance in which the evidence compelled only one factual conclusion. Rather, the family court was presented with conflicting testimony concerning whether Grandparents had become Child's primary caregivers and financial supporters within the meaning of KRS 403.270, or whether the parties instead functioned in an ongoing cooperative caregiving arrangement in which Father continued exercising his parental role despite Child's substantial periods of residence with Grandparents.

Our decision in *Burgess v. Chase*, 629 S.W.3d 826 (Ky. App. 2021), is instructive. In *Burgess*, this Court reversed an award of *de facto* custodian status where a grandmother had regularly cared for her grandchild for approximately thirteen years, but the child's natural mother continued exercising

parenting time during school breaks and provided at least some financial support. Although this Court acknowledged the grandmother's substantial caregiving role and generous financial support, we nevertheless concluded she did not stand in the place of the child's natural parent because the mother continued exercising parental responsibilities and maintaining a parental relationship with the child. *Id.* at 832 ("We agree with Samantha that despite Joyce's generous provision of care and financial support, under these facts Joyce was simply parenting Child alongside Samantha due to Samantha's continuing to exercise her parenting time and to provide for and make decisions for Child during such parenting time. So, it was error to accord Joyce de facto custodian status.").

The Successor Judge, acting as factfinder, was entitled to weigh the competing testimony, assess witness credibility, and resolve those factual disputes. While the record unquestionably contains evidence favorable to Grandparents, the existence of conflicting proof does not permit this Court to substitute its judgment for that of the family court. Because substantial evidence supported the family court's determination that Grandparents failed to establish *de facto* custodian status under KRS 403.270, we find no reversible error.

### III. CONCLUSION

For the foregoing reasons, we affirm the order of the Marshall Family Court.

-15-

ALL CONCUR.


BRIEFS FOR APPELLANTS:

Chris Hendricks
Whitney E. Stringer
Murray, Kentucky

BRIEF FOR APPELLEE SHAWN D. HAMLET:

Lisa A. DeRenard
Benton, Kentucky